Filed 4/25/13  P. v. Leon-Guerrero CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIEANN LEON-GUERRERO,<br><br>    Defendant and Appellant. | A134353<br><br>(Solano County<br> Super. Ct. No. FCR 275753) |

Defendant was convicted following a jury trial of attempted voluntary manslaughter (Pen. Code, §§ 664, 192, subd. (a)),[1] infliction of corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)), and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), with enhancements for personal infliction of great bodily injury (Pen. Code, § 12022.7, subd. (e)).  In this appeal she claims the trial court erred by failing to instruct the jury as requested by the defense that the specific intent required to prove attempted voluntary manslaughter may be negated by voluntary intoxication.  We conclude that the instructions given by the trial court when viewed in the aggregate properly and adequately advised the jury on the law of specific intent and voluntary intoxication as related to the lesser offense of attempted voluntary manslaughter. Therefore, we affirm the judgment.

---

[1] The lesser included offense of the charge of attempted murder.

**STATEMENT OF FACTS**

Defendant and the victim Arnell Leon-Guerrero were married in 2002.[2] They had two children together, and Arnell adopted defendant's son from a previous relationship. By all accounts their marriage was marked by frequent hostility and quarrels, increasingly so as time went on.

In 2007, defendant and Arnell moved with their children to California. They lived in Antioch and Rodeo, and by August of 2008, they purchased a home in Suisun, but their relationship continued to deteriorate. On February 26, 2010, defendant attempted to commit suicide in front of two of the children by taking pills, and was briefly hospitalized. Soon thereafter, Arnell filed for divorce and obtained a "restraining order and a move-out order" against defendant. Arnell and the children stayed in the Suisun residence while defendant lived temporarily with a friend and in a women's shelter. Arnell's aunt Norma Taitano moved into the house to help Arnell with the care of the children.

Although the divorce proceeding continued, Arnell and defendant decided to "work on the marriage." In March, defendant moved back into the house with Arnell and the children, but she "was constantly crying" and depressed. Arnell and defendant continued to have arguments, primarily over money. Arnell slept "on the couch," and the relationship did not improve.

On Sunday, April 25, 2010, the entire family attended church services, then Arnell planned to attend his "study group" in Fairfield. Arnell testified that defendant attempted to prevent him from leaving the house by blocking the door and yelling, "No, you're not going. I'm going with you." Arnell ran out of the house through the garage and left in his truck.

While on the way to his study group at the University of Phoenix in Fairfield, Arnell became concerned for the children left at home with defendant "screaming," so he called Taitano and asked her to meet him to "take the kids to The Jungle in Concord."

---

[2] For the sake of clarity and convenience we will refer to the victim Arnell Leon-Guerrerro by his first name.

Taitano and the children met with Arnell at around 2:30 p.m. They all went to The Jungle, where they stayed until 6:30 p.m. Taitano then took the children home, while Arnell drove his truck to a park in Suisun to rest and recover from "allergies" and a "really bad migraine." Two hours later, Arnell drove home.

When Arnell arrived home at around 8:30 p.m., defendant was at a neighbor's house, "sitting in front of their garage, just waiting." The children and Taitano were in the bedroom, sleeping. After checking on the children Arnell took allergy pills and Tylenol with codeine, and "basically . . . went to sleep" on the couch in the living room. Later, defendant came into the living room to sleep with defendant on the couch. Arnell was awakened momentarily, but "just went back to sleep." Later still, Arnell woke up again when he was hit in the head. He looked up from the couch to see defendant standing above him, holding two knives. Arnell rolled over onto his back and asked why defendant hit him. She struck down with the two knives, one in each hand, slicing open his stomach. As Arnell rolled off of the couch and stood up, his "intestines came out." He "pushed it back in," and fell on top of defendant, with both of them lying face down onto the hardwood floor in the kitchen.

Arnell yelled for help and held defendant's arms. Defendant still had a knife in her left hand and continued to stab at Arnell from underneath him. Taitano heard a "thump" and Arnell's call for help. She came out of the bedroom and saw Arnell and defendant on the floor under the dining room table. They were facing each other, with Arnell's arms around defendant. As Taitano attempted to pull them apart, she noticed defendant raise her arm above her head, with a "sharp object" in her hand. Taitano pulled defendant onto her back, away from Arnell, and tried to pry the knife away from her. The knife blade snapped as they struggled, but defendant maintained her hold on the broken blade. Taitano and Arnell continued to restrain defendant and attempt to extract the knife from her hand. At Taitano's directive one of the children called 911.

When a police officer arrived at the house Arnell and Taitano were still holding defendant on the floor. Defendant still had the tip of a broken steak knife in her hand. Arnell had a severe, extensive gash from his belly button to his left side. The officer

3

stood with his foot on defendant's wrist until paramedics arrived to treat the victim and place him on a gurney for transport to the hospital. Defendant then released the knife, whereupon the officer pushed it away from her. The officer observed that defendant had blood on her hands and body, but did not notice any stab wounds or injuries to her face.

At the hospital Arnell was treated for 16 separate stab wounds. The most critical injury was a six-inch wound to the left side of the abdomen, which damaged his colon. He also suffered stab wounds to the heart area, sternum, neck, right arm, and scalp.

Defendant testified in her defense that Arnell was physically abusive to her a "lot of times" during nearly the entirety of their relationship. She did not "want him to get in trouble," so she did not report the abuse. By the time they moved to Rodeo and then to Suisun, Arnell was employed by Loomis as an armored car driver. He carried a .45-caliber handgun, and had a shotgun at home. Arnell threatened defendant with the shotgun by hitting her with it and pointing it at her head. Arnell continued to abuse her while they lived in Suisun by hitting her, choking her, breaking her nails, and forcing her to "have sex with him." To avoid having him arrested defendant did not report the abuse. On one occasion in 2009, after Arnell hit and choked defendant, she told him, "I will stab you with a knife," if he touched her again.

Defendant testified that in January of 2010, she discovered Arnell "was cheating." On February 25, 2010, Arnell beat defendant and admitted to her that he had a girlfriend named Faviola. Arnell told defendant that he did not love her and did not want her "at the house." The next day defendant "took a lot of pills," blacked out, and was taken to the hospital. The hospital staff noticed scratches and bruises defendant's arms. In response to an inquiry at the hospital, for the first time defendant disclosed that she had been abused by Arnell. She was referred to a battered women's shelter, but returned home the next day.

On March 1, 2010, Arnell learned that defendant called and texted Faviola. According to defendant, Arnell became "really angry" and "crazy." He grabbed, choked and hit her. The police came to the house in response to defendant's call, and photographs were subsequently taken that depicted bruises and scratches inflicted on her

4

by defendant.[3]  Later that same day, Arnell obtained a restraining order against her and filed for divorce in retaliation for her act of "call[ing] the police on him."  Arnell expressed hatred of defendant and concern that he would lose his job and military benefits due to her report of abuse.

Two days later, defendant left the house when the restraining order was served on her.  She stayed first with a friend for a few days, then moved to the Safe Quest women's shelter.  While at the shelter defendant obtained a restraining order against Arnell.  On March 16, 2010, Arnell "dropped the restraining order and the divorce" proceedings, and asked defendant to come home "to work things out."  Defendant agreed, to be with her children and "make the marriage work."  After defendant returned home, however, Arnell told her he wanted to continue relationships with both her and his girlfriend.  Defendant was angry, and took their youngest son with her to temporarily live at a friend's house.  Arnell threatened to report to the police that defendant "kidnapped" her son, so she returned to the house.  Their arguments continued.

Defendant testified that on the morning of April 25, 2010, Arnell expressed that he did not want her to accompany the rest of the family to church services.  When defendant cried and pleaded with defendant to "go with him," he threw shoes at her, causing "big bruises" to her legs.  Arnell directed defendant to sit in the back of the truck for the trip to church.

When the family returned from church Arnell announced that he was "going to the library."  Defendant objected, but Arnell "left anyway."  Later, Taitano and the children also left, forcing defendant to stay outside the house, as Arnell had taken away her key.

Around 8:30 that night, Arnell returned and let defendant in the house.  The children and Taitano were asleep in the bedroom.  Arnell and defendant argued in the living room.  Defendant agreed to divorce Arnell and return to her home in the Philippines with the children, but Arnell told her she had to leave by herself.  Defendant said, "I'm staying here."  They continued to argue, and Arnell forced defendant to "give

---

[3] The photographs were shown to the jury.

5

him oral sex." Arnell expressed anger that defendant was "not doing it right," and bit her on the arm. Defendant then went into the bedroom and took "a lot" of pills that were in the medicine cabinet in the bedroom, along with some alcohol Arnell was drinking.

According to defendant's testimony she did not recall the events that transpired thereafter until she "woke up in the hospital." She did not know "what had happened" or why she was in the hospital. Defendant asserted that she did not want to attack Arnell or intend to kill him. She did not remember getting any knives or attacking Arnell. She testified that the female voice yelling, "He's hitting me," on the recording of the 911 call played for the jury, was her.

A Suisun police officer who arrived at the house not long after the stabbing occurred testified for the defense that he secured defendant by the arm. The officer "smelled alcohol" on defendant and noticed that she "appeared to be intoxicated," and in an altered mental state. When defendant was asked why she stabbed defendant she replied, "Because he hit me." Another officer reported that at the crime scene defendant was "rambling and not always comprehensible." Defendant repeatedly exclaimed that Arnell hit her while they were "having sex." Later, at the hospital, defendant would not respond to any of the officer's questions.

Evidence to corroborate defendant's testimony that Arnell abused her was presented by the defense. Defendant's friend Maria Padua testified that she observed defendant with injuries; defendant told Padua that her husband "hit her." Vanessa Adams, a domestic violence community advocate at Safe Quest, recounted that defendant appeared at the domestic violence shelter in February of 2010, crying, and stating that she had been assaulted. Adams subsequently took defendant to the Suisun Police Department, where photographs were taken of bruises on her neck, arm and shoulder. Adams also contacted defendant at the hospital after the stabbing of Arnell. Defendant was upset, crying, and did not appear to be aware of the reason for her restraint at the hospital.

Reginald Garcia, a former police officer with the City of Vallejo, and a domestic violence volunteer at Safe Quest, testified that he spoke with defendant in late February

6

and early March of 2010. Defendant disclosed to Garcia that she had been repeatedly physically abused by Arnell, and told by him that his girlfriend would be moved into the residence. Defendant expressed reluctance to report the abuse for fear that "her husband would lose his job."

The defense also presented expert opinion testimony on Battered Women's Syndrome from Dr. Linda Barnard, a licensed marriage and family therapist. Dr. Barnard described the symptoms typically exhibited by battered women, that include: "post-traumatic stress disorder," hyper-vigilant response to "situations that they perceive as dangerous," and "not reporting" or "minimizing the violence" to protect the abuser. Battered women also may experience "traumatic memory," that results in memory loss of an overwhelmingly distressing event, and "disassociation," a subconscious phenomenon by which emotion is "split off" from an experience. After interviewing defendant and reviewing the records in the present case, including the police reports and preliminary hearing transcript, Dr. Barnard concluded that defendant "was a battered woman" and suffered from "post-traumatic stress disorder."

## DISCUSSION

Defendant asserts that the trial court instructions on the lesser included offense of attempted voluntary manslaughter and voluntary intoxication were deficient. She claims an instruction in the terms of CALCRIM No. 3426, as requested by defense counsel, was necessary to adequately inform the jury that "attempted voluntary manslaughter was a specific intent crime, and that voluntary intoxication could negate the specific intent required for that offense."

CALCRIM No. 3426 is "a limiting instruction regarding the use of the evidence of defendant's voluntary intoxication." (*People v. Lucas* (2013) 214 Cal.App.4th 707, 712.) The instruction advises the jury to consider evidence of voluntary intoxication only in deciding whether the defendant acted with the specific intent or mental state required to establish the charged offenses, and for no other purpose, defines voluntary intoxication, and states that in connection with charged offenses requiring specific intent or mental state the People have the burden of proving beyond a reasonable doubt that the defendant

7

acted with the specific intent or mental state required, and if the People have not met this burden, the jury must find the defendant not guilty of the specified offenses.[4] Defendant acknowledges the trial court "*did* inform the jury, when instructing on the elements of attempted voluntary manslaughter, that one of the elements was an intent to kill," but complains of the failure of the court to either "specifically state" that the crime of attempted voluntary manslaughter requires proof of specific intent to kill, or to advise the jury "they could consider voluntary intoxication as negating the specific intent required for attempted voluntary manslaughter." As a result, argues defendant, the "instructions, as a whole," failed to properly express to the jury the requirement of specific intent to kill, "or that voluntary intoxication could negate the specific intent required for attempted voluntary manslaughter."

"In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585; see also *Sandstrom v. Montana* (1979) 442 U.S. 510, 514;

---

[4] The standard CALCRIM No. 3426 instruction reads as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with _____ <insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .' or 'the intent to do the act required'>.
   "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.
   "[Do not consider evidence of intoxication in deciding whether _____ <insert non-target offense> was a natural and probable consequence of _____ <insert target offense> .]
   "In connection with the charge of _____ <insert first charged offense requiring specific intent or mental state> the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with _____ <insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .'>. If the People have not met this burden, you must find the defendant not guilty of _____ <insert first charged offense requiring specific intent or mental state>.
   "<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>
   "You may not consider evidence of voluntary intoxication for any other purpose. [Voluntary intoxication is not a defense to _____ <insert general intent offense[s]> .]"

8

*People v. Warren* (1988) 45 Cal.3d 471, 487; *People v. Smith* (1992) 9 Cal.App.4th 196, 201.) "A court is required to instruct the jury on the points of law applicable to the case, and no particular form is required as long as the instructions are complete and correctly state the law." (*People v. Andrade, supra,* at p. 585.) "When a claim is made that instructions are deficient, we must determine whether their meaning was objectionable as communicated to the jury. If the meaning of instructions as communicated to the jury was unobjectionable, the instructions cannot be deemed erroneous." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 70–75; *People v. Kelly* (1992) 1 Cal.4th 495, 525; *People v. Fonseca* (2003) 105 Cal.App.4th 543, 549.) " '[W]e look to whether it is reasonably likely the jury understood the instruction and correctly applied it.' [Citation.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1312.) " 'The meaning of instructions is no[t] . . . determined under a strict test of whether a "reasonable juror" *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' [Citation.]" (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312.)

In our determination of the adequacy of the trial court's instructions in the present case, we must adhere to the precept that a challenged instruction " ' "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.' [Citation.]" (*People v. Ramirez* (1997) 55 Cal.App.4th 47, 58.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citation.]' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 987; see also *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) "Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions." (*People v. Tatman* (1993) 20 Cal.App.4th 1, 11; see also *People v. Harris* (1994) 9 Cal.4th 407, 426; *People v. Houston* (2005) 130 Cal.App.4th 279, 312.)

Looking at the offense of attempted voluntary manslaughter, we agree with defendant that specific intent to kill is an essential element of the crime, although intent to kill is not a necessary element of voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101, 110.)[5] "An *attempt* to commit a crime requires a specific intent to commit the crime. [Citation.] This is true 'even though the crime attempted does not [require a specific intent].)' [Citation.]" (*People v. Gutierrez, supra,* 112 Cal.App.4th 704, 710; see also *People v. Villanueva* (2008) 169 Cal.App.4th 41, 54, fn. 12.) The offense of *attempted* voluntary manslaughter, like any attempt to commit an offense, requires proof that the perpetrator acted with the requisite specific intent. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1546–1547; *People v. Simington* (1993) 19 Cal.App.4th 1374, 1379.)

"Notwithstanding the fact that murder may be committed without an intent to kill, it has long been held that the crime of attempted murder does require an intent to kill. ' "To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to murder, he must so intend." ' [Citation.]" (*People v. Montes, supra,* at p. 1549.) "If the crime of attempted murder requires a specific intent to bring about a desired result" of the killing of a human being, "then . . . the crime of attempted voluntary manslaughter must also require a specific intent to bring about that same desired result (the killing of a human being)." (*Id*. at pp. 1549–1550; see also *People v. Blakeley* (2000) 23 Cal.4th 82, 90.) Thus, had defendant been "successful in negating the intent to kill element necessary for the jury to find attempted murder, the jury likewise could not have found the elements of attempted voluntary manslaughter, which also requires an intent to kill." (*People v. Walker* (1993) 14 Cal.App.4th 1615, 1624; see also *People v.*

---

[5] "Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] " (*People v. Lasko, supra,* 23 Cal.4th 101, 108.)

"Voluntary manslaughter is a lesser included offense of murder when the requisite mental element of malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense. 'Only these circumstances negate malice when a defendant intends to kill.' [Citation.]" (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.)

10

*Johnson* (1996) 51 Cal.App.4th 1329, 1332; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1692.)

We also have no dispute with the premise that evidence of voluntary intoxication may negate the specific intent necessary to prove attempted voluntary manslaughter. An instruction on voluntary intoxication is required when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's ability to form the required specific intent or mental state at the time the crime was committed. (See *People v. Tully* (2012) 54 Cal.4th 952, 1025–1026; *People v. Williams* (1997) 16 Cal.4th 635, 677.) Substantial evidence of defendant's voluntary intoxication was presented at trial, and the impact of intoxication on her mental state was at issue.

Contrary to defendant's claim, however, we are persuaded that the instructions accurately and adequately conveyed the law of voluntary intoxication as related to defendant's intent to kill, even without inclusion of CALCRIM No. 3426. The court gave the standard instructions on reasonable doubt (CALCRIM No. 220) and union of act and intent (CALCRIM No. 252), which essentially advised the jury the People must prove beyond a reasonable doubt that defendant acted with the particular intent required for each charged crime. The attempted murder instruction told the jury the People must prove "the defendant intended to kill that person." Voluntary manslaughter, based on acts committed in a sudden quarrel or heat of passion, or in the unreasonable but good faith belief in having to act in self-defense, was defined for the jury.

In addition, the court specifically informed the jury that "attempted murder is reduced" to "the lesser crime" of "attempted voluntary manslaughter" if the attempt to kill the victim occurred "because of a sudden quarrel or in the heat of passion," or if the "defendant acted in imperfect self-defense," and "the defendant intended to kill that person" when she acted. Immediately following an instruction that the People have the burden of proving intent to kill "beyond a reasonable doubt," the court also gave the CALCRIM No. 625 voluntary intoxication instruction, in lieu of CALCRIM No. 3426, which specifically directed the jury to consider "the defendant's voluntary intoxication

11

only in a limited way," to decide "whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation."

We find no error in the instructions considered as a whole and in the context of the trial record. Although the attempted voluntary manslaughter instruction did not specifically refer to voluntary intoxication and intent to kill, the remaining instructions, including CALCRIM No. 625, unmistakably advised the jury that attempted voluntary manslaughter required proof of intent to kill, and that evidence of voluntary intoxication may negate the requisite intent. The jury also knew that all essential elements of the crimes, including specific intent, must be proved beyond a reasonable doubt. We have no doubt the jurors were able to comprehend from the totality of the instructions given that the People have the burden of proving beyond a reasonable doubt the defendant acted with the specific intent or mental state required of the charged offenses, in light of the evidence of voluntary intoxication. We assume the jurors properly correlated the instructions given to understand the People's burden to prove specific intent to kill. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1077; *People v. Welch* (1999) 20 Cal.4th 701, 767; *People v. Frazier* (2005) 128 Cal.App.4th 807, 818; *People v. Ayers* (2005) 125 Cal.App.4th 988, 997.) The instructions given adequately and unambiguously covered the law of specific intent and voluntary intoxication. Therefore, the trial court did not err in refusing to give CALCRIM No. 3426, which was essentially a duplicative instruction under the circumstances. (See *People v. Thomas* (2012) 53 Cal.4th 771, 826; *People v. Friend* (2009) 47 Cal.4th 1, 50; *People v. Carter* (2003) 30 Cal.4th 1166, 1231.)

Defense counsel's argument to the jury reinforced the concept that defendant's voluntary ingestion of drugs or alcohol may have impaired her ability to form the specific intent to kill the victim, a necessary element to convict her of attempted voluntary manslaughter. Counsel specifically urged the jury to acquit defendant of attempted murder or attempted voluntary manslaughter, "specific intent crimes," if "she was voluntarily intoxicated." Counsel's argument clarified that lack of proof beyond a reasonable doubt of specific intent due to voluntary intoxication demanded acquittal. (See *People v. Mills* (2012) 55 Cal.4th 663, 677–678; *People v. Williams* (2010) 49

12

Cal.4th 405, 457–458.)  Considering the instructions given, the entire record of trial, and the arguments of counsel, we find there is no reasonable likelihood that the jury misconstrued or misapplied the law of specific intent and voluntary intoxication.  (See *People v. Mathson, supra,* 210 Cal.App.4th 1297, 1311–1312.)

     Accordingly, the judgment is affirmed.


                             _____

                             Dondero, J.


We concur:


_____

Margulies, Acting P. J.

_____

Banke, J.