Filed 4/11/14  P. v. Ramirez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NOE RAMIREZ,<br><br>    Defendant and Appellant. | B245430<br><br>(Los Angeles County<br>Super. Ct. No. VA116911) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed with directions.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

A jury convicted appellant Noe Ramirez of voluntary manslaughter of Ricardo Rojas (Pen. Code, § 192, subd. (a)),[1] assault with a semiautomatic firearm upon both Claudia Rojas and Adrian Rojas[2] (§ 245, subd. (b)), assault by means of force likely to produce great bodily injury upon Damian Prado (§ 245, subd. (a)(4)), and assault with a firearm upon both Claudia and Adrian (§ 245, subd. (a)(2)).  The jury further found firearm allegations to be true (§ 12022.5, subd. (a)).  Pursuant to section 1385, the court subsequently dismissed the counts for assault with a firearm because it was a lesser included offense of assault with a semiautomatic firearm.  The court denied probation and sentenced appellant to a total term of 19 years eight months in state prison.

Appellant contends (1) the trial court erred in refusing to instruct the jury on self-defense and defense of others, (2) substantial evidence did not support the true finding on the firearm allegations, and (3) the abstract of judgment erroneously states he was convicted of assault with a deadly weapon, rather than assault by means of force likely to produce great bodily injury.  We agree the abstract of judgment should be corrected in the manner suggested by appellant but otherwise affirm.

## STATEMENT OF FACTS

### 1.  *Prosecution Case*

Prado was planning on attending a birthday party in Bell Gardens for his friend Ricardo on September 17, 2010.  Earlier that day he met appellant and another person in the parking lot of a Denny's restaurant to sell appellant drugs.  When he got there, they told him he was in their gang territory, the J.B.I. gang, and he had to pay "taxes" for selling in their territory.  Prado got scared and ran away before he had given appellant the drugs.  Later that night, but before going to Ricardo's party, he received a text message

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     For the sake of clarity we will refer to the various members of the Rojas family by their first names, rather than their surname.  Additionally, another witness, Vicente Ramirez, shares a surname with appellant.  We will also refer to him by his first name to avoid any confusion.  We do not intend this informality to reflect a lack of respect.

2

from appellant that said: "A, we got BG on lock down fool. This shit's coming back to you. That's on my life it is." Shortly after that he received another text message from appellant that said: "I'm gonna find you fool, I am. And I don't give a fuck about the hundred T, that ain't shit to me, I'm gonna take you though." Prado felt threatened and was scared after receiving these text messages. He nevertheless went to Ricardo's birthday party.

Vicente is appellant's acquaintance. He attended Ricardo's birthday party as well. He talked to appellant on the telephone and also communicated with him via text message on September 17, 2010, before the party. Appellant told Vicente someone had stolen money from him, but he did not know the person's name. He described the person to Vicente and told him he met the guy at a Denny's, and from there they drove together to a house. He said the guy went inside and never came back out. Vicente told appellant the person was Prado. He sent a text message to appellant stating: "Don't tell anyone what happened to you. Keep it low cuz word gets around fast in BG and he'll strap up." When Vicente said "strap up," he meant Prado would arm himself with a gun.

Thirty to 40 people attended Ricardo's birthday party. At approximately 12:27 a.m. on September 18, Vicente was at the party and sent appellant the following text message: "For sure this fool Prado jacked you. That fool looks all freshed out, new everything. I seen him right now." Vicente and appellant exchanged a number of additional text messages in the following 15 minutes in which Vicente told him Prado was in Bell Gardens, gave him Prado's address, and told him how many people were accompanying Prado. Vicente then called appellant. Appellant sounded confident on the phone, like he had a plan. Appellant also seemed aggravated. At around 1:37 a.m., Vicente sent appellant text messages informing him that Prado was wearing a red shirt, black pants, and no hat.

Jessica Valle, Ricardo's friend, was another one of the partygoers. Late in the evening, she and two friends left the party to retrieve some things from one friend's car. A black truck pulled up and parked in front of her friend's car. Appellant was in the front passenger seat. He asked them where the party was located. Valle did not recognize him

3

and "felt something was wrong," so she and her friends told him they did not know of any party. Appellant then asked where Prado was and said Prado was a friend and had told him to come. Appellant and his two companions, Sebastian Avila and Jeffrey Martinez, followed Valle as she walked back to the party. They continued to ask about Prado. Another partygoer passed by them and directed appellant to Prado.

At approximately 1:15 a.m. or 1:30 a.m. on September 18, Prado was in Ricardo's backyard. Someone told him people were looking for him, and he started walking toward the gate to the front yard. As soon as he opened the gate, he got hit in the head with an object. He thought he might have been shot because he had blood all over his face and he heard three to four gunshots at the same time he was attacked. Appellant and his two companions were attacking him. He tried to fight back but was overwhelmed. He thought one of his three attackers fired the gunshots he heard. The attack lasted approximately six seconds before "the whole party ran up" and he was able to escape.

Ricardo's brother Adrian and his sister Claudia saw appellant and his companions arrive at the party at approximately 1:15 a.m. Ricardo, Adrian, and Claudia were in front of the house when they heard fighting and screams and ran toward the back of the house. Ricardo tried to break up the fight by pulling Avila back by the shirt and getting in front of Avila. Avila responded by shooting Ricardo. Adrian heard between two and three gunshots and heard Ricardo say, "He shot me." Avila continued shooting towards the backyard. Another partygoer, Steve Agramon, then came up to Avila and shot him.

Appellant tried to pick up Avila, who had fallen to the ground and appeared to be badly wounded, and take him away. Adrian and Claudia saw appellant had a black gun in his hand and was pointing it at everybody around him while he was trying to drag Avila with the other hand. Appellant was waving the gun back and forth around the crowd and aimed the gun at Adrian and Claudia. Adrian was scared and told appellant, "Don't shoot." When appellant aimed the gun at Claudia, he told her to "stay away." He was so close to Claudia that she tried to move his hand so he would point the gun elsewhere, but he continued to point it at her. She tried to take cover by ducking behind the wheel of Adrian's green truck, which was parked in the driveway next to them. She

4

was frightened appellant was going to shoot her because he kept pointing the gun at her. He did shoot Claudia in the arm from approximately six inches away. The bullet went through her arm. She identified him as the person who shot her both in court and in a six-pack photographic lineup the day after the shooting.

Adrian ran at appellant, tackled him, and hit him in the face. Appellant did not have his gun anymore. Adrian told the other partygoers around to look for the gun. He held on to appellant with one hand and opened his truck door with his other hand to look for an object with which to hit appellant. He found a plastic tube but dropped it and continued to hit appellant with his hands. Appellant started to run off and Adrian chased him and struck him again. There was a commotion around appellant because other people were pulling on him as he was trying to leave. The police arrived as Adrian was struggling with appellant. Officers Edward Roberts and Angel Puente of the Bell Gardens Police Department responded to the scene. Officer Roberts observed a crowd of people streaming out from behind the house. He also saw a crowd of people attacking appellant on the lawn. Claudia told the officers appellant had shot her, and they arrested him. When Officer Roberts searched appellant, he did not have a weapon on his person.

Detective Steven Blagg was one of the investigating officers in the case. He interviewed appellant on September 19, 2010. Appellant said he wanted to talk to Detective Blagg "to work all this out." Appellant was dating Avila's younger sister and considered Avila his brother-in-law. Avila had cofounded the J.B.I. gang in the late 1990's and had been a member ever since. Their other companion, Martinez, was Avila's brother-in-law. Appellant did not know Avila had died until Detective Blagg told him during their interview; appellant started crying when he found out. Avila had been shot with .40-caliber bullets. The police did not recover any .40-caliber weapons from the scene but found a number of Smith & Wesson .40-caliber cartridge cases in the back patio area. Four .40-caliber Smith & Wesson bullets were recovered from Avila's body.

Appellant told the detective he put a gun in Adrian's green truck that was parked in the driveway at the party. Appellant took the gun from Avila. He said he did not know Avila had a gun until after Avila was shot and Avila gave his gun to appellant.

5

Appellant told the detective that when a crowd of people approached, he held the gun out in front of his person in a pointing motion. He hid the gun inside the green truck so no one would take it from him. He said he never fired the gun. The detective went back to the scene of the party and recovered a 28-millimeter FN Herstal pistol from the right rear floorboard of the green truck. He found one live cartridge in the chamber. A magazine for an FN Herstal pistol was found in the backyard area approximately 15 to 20 feet away from Avila's body.

Manuel Munoz was the firearm expert with the Los Angeles County Sheriff's Department who processed the crime scene. He explained a magazine houses the ammunition for a gun. A cartridge is one unit of ammunition for a semiautomatic pistol. As the pistol is fired, a cartridge case ejects from the pistol. Munoz recovered three 28-millimeter cartridge cases from the scene, all fired from the FN Herstal pistol. He found one near the gate of the house. The other two were adjacent to the green truck in the driveway. Three 28-millimeter bullets fired from the FN Herstal pistol were recovered from Ricardo's body. The FN Herstal magazine recovered by Detective Blagg contained 16 live 28-millimeter cartridges, meaning they had not been fired. The magazine had a capacity of 20 cartridges. The FN Herstal pistol could not have been fired if the magazine had been ejected from it.

Appellant's hands were tested for gunshot residue on September 18, 2010. The results were positive, meaning he had fired a gun, handled a gun, or otherwise came into contact with an environment of gunshot residue.

*2. Defense Case*

Appellant called several character witnesses, including members of his own family, Avila's family, and his girlfriend. He also testified in his own defense. Appellant was 20 years old in September 2010. He met Avila when he was 15 years old and started dating Avila's sister. He did not know Avila had gang ties until two years later, when he saw a tattoo on Avila's chest. Avila told appellant he used to be in a gang. Appellant never knew Avila to have a gun or other weapons. He also never knew him to be a violent or vengeful person.

Around June 2010, appellant started selling drugs as a "middle man" for another drug dealer. He sold methamphetamine, acid, marijuana, and Ecstasy. Appellant met Prado around June 2010. He contacted Prado because sometimes appellant's regular supplier would run out of drugs. On September 17, 2010, appellant talked to Prado about buying $100 worth of marijuana for personal use. They agreed to meet at Denny's at around 4:15 p.m. Appellant drove his car there alone and picked up Prado. Prado directed him to a nearby address where he was supposed to retrieve the marijuana. Appellant gave Prado the money for the marijuana. When they arrived at the address, Prado said he was going inside and would return shortly. Prado had not returned after approximately five minutes. Appellant tried calling and sending him text messages to no avail. Appellant looked around the house and saw the back door was open and a back driveway led to the street. He realized Prado had taken his money and ran off. Appellant was mad but he did not think he would find Prado.

Appellant went to a Dodgers baseball game after that. Before he went, appellant talked to Martinez and told him how Prado had stolen his money. At the time, he did not know Prado's name; he had Prado's phone number saved in his cell phone under "weird" because he got a "bad vibe" from Prado. Avila called appellant at approximately 8:30 p.m. while he was at the Dodgers game. He had heard about Prado stealing appellant's money and was upset about it. They made plans to meet at Avila's house after the baseball game. From there, they left in Avila's black truck to pick up Martinez. Appellant thought they were going to look for Prado. He intended to beat up Prado if he found him. That was why he sent Prado the text message saying he had "BG on lockdown." Appellant did not have a weapon when he got into Avila's truck. He did not know Avila had one. They did not discuss weapons.

Appellant had been talking with Vicente that evening. Vicente told him the person for whom he was looking was Prado. He gave appellant directions to the vicinity where he had seen Prado. When appellant, Avila, and Martinez got to Ricardo's street, they saw some girls outside and asked them where the party was located. The girls directed them

7

to the party and told them Prado was there.  The three of them followed the girls up to Ricardo's house.

They walked up the lawn and Prado came out.  Avila started punching him first and then appellant jumped in.  He hit Prado three or four times and grabbed him in a headlock.  People started hitting appellant and he fell to the ground.  He got up and was preparing to fight another person who was standing in front of him.  Then he heard one or two gunshots so close to him that he could feel the heat from the shots.  He ducked and saw Avila leaning on the gate and then Ricardo falling on the ground next to appellant.  Appellant jumped over Ricardo and ran toward the front of the house.  He thought Avila was following him, but when he was almost there, he turned around and saw Avila going to the backyard.  He followed Avila and heard many more gunshots.  He was hit in the left hand with something and took shelter against the car in the driveway.  That was when he saw Claudia, who had been shot.

Appellant went to find Avila, who was rolling on the ground and trying to stand up.  Avila had been shot and had a lot of blood on him.  Appellant picked him up and tried to help him walk.  When it became apparent Avila could not walk, appellant dragged him to the green truck in the driveway.  Avila handed appellant a gun and told him to take it.  Appellant did not drop the gun because he did not want someone to pick it up and use it against him.  He held the gun by its grip in his right hand and had his left arm wrapped around Avila.  He had his right arm extended out at a 120 degree angle.  People kept trying to come close to him and he told them to "get away, get away."

Appellant let go of Avila and hid the gun in the passenger side of the green truck.  He never tried to shoot the gun.  After he closed the truck door, Adrian came at him and asked where the gun was.  Adrian hit the injured Avila and then appellant started fighting with Adrian.  Several more people descended on appellant and started hitting him.  He extracted himself from the fight and turned around to see a police officer.  Claudia screamed that appellant had shot her brother.

8

After appellant entered the yard with Martinez and Avila, he did not see Martinez again until after the shootings had occurred and the police arrived.  The next time he saw Martinez, he was on a gurney being taken away in an ambulance.

## STANDARD OF REVIEW

Asserted instructional errors are questions of law that we review de novo.  (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.)  We review the sufficiency of the evidence to support a sentencing enhancement "according to accepted rules of appellate review:  we view the record in the light most favorable to the prosecution and may not reverse the judgment if any rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt."  (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897.)

## DISCUSSION

### 1.  *Self-defense or Defense of Others Instruction*

Appellant contends the trial court violated his due process right to present a defense when it refused to instruct on self-defense and defense of others.  He further argues the error requires us to reverse his conviction for assault with a semiautomatic firearm upon both Claudia and Adrian.  We do not agree the trial court erred.

### a.  Background

Appellant requested that the court instruct the jury on self-defense and defense of others.  The pattern self-defense instruction, CALJIC No. 5.30, states:

"It is lawful for a person who is being assaulted to defend [himself] [herself] from attack if, as a reasonable person, [he] [she] has grounds for believing and does believe that bodily injury is about to be inflicted upon [him] [her].  In doing so, that person may use all force and means which [he] [she] believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

Similarly, the pattern defense of others instruction, CALJIC No. 5.32, states:

9

"It is lawful for a person who, as a reasonable person, has grounds for believing and does believe that bodily injury is about to be inflicted upon [another person] [ ___ ] to protect that individual from attack.

"In doing so, [he] [she] may use all force and means which that person believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

Appellant argued: "[T]he testimony indicated that when [appellant] was dragging Mr. Avila out of the -- out of the party, he somehow took the gun or was given the gun by Mr. Avila. At that point, he either pointed or not pointed the gun. If the jury believes that he pointed the gun, then he is entitled to the self-defense instruction. If the jury believes that he did not point the gun, then there would be an acquittal of those two charges against Adrian Rojas and Claudia Rojas." The court denied appellant's request and determined there was insufficient evidence to support the giving of those instructions.

### b.  Analysis

Generally, "[a] party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868, overruled on another ground by *People v. Gaines* (2008) 46 Cal.4th 172, 181 fn. 2)  "A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.)  Thus, "[a] trial court is required to instruct sua sponte on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case. [Citation.] . . . [Citation.] [¶] Of course, even if the defendant requests instruction on a defense, the trial court need not give the instruction if it is not supported by substantial evidence." (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.)

Under the doctrine of self-defense, "one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury." (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on another ground by *People v. Chun* (2009) 45 Cal.4th 1172, 1200-1201.) Likewise, defense of others also requires an actual and reasonable fear of imminent harm. (*People v. Butler* (2009) 46 Cal.4th 847, 868; CALJIC No. 5.32.) "[A] jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .'" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.) The defendant must show the conduct of the other party was such as to produce a fear of serious bodily injury in a reasonable person. (*People v. Watie* (2002) 100 Cal.App.4th 866, 877.)

But "[i]t is well established that the ordinary self-defense doctrine -- applicable when a defendant *reasonably* believes that his safety is endangered -- may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Accordingly, "[t]he person who wrongfully attacks, or who voluntarily engages in a fight, and is met by a counterattack, has no privilege to stand his ground and defend." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 78, p. 519.) Instead, one who assaults another, or has "'created appearances justifying the other'" to counterattack in self-defense, cannot use force in claimed self-defense "'unless he has first, in good faith, declined further combat, and has fairly notified [the other] that he has abandoned the affray.'" (*People v. Watie, supra*, 100 Cal.App.4th at p. 877.)

Here, the trial court correctly determined substantial evidence did not support the giving of self-defense and defense of others instructions. Appellant argues he was actually and reasonably in fear of imminent harm when he brandished Avila's gun because one or more of the partygoers could have assaulted or killed him (as they did Avila) during the chaotic scene at the party. Contrary to appellant's theory, there was no evidence he was in imminent danger of serious physical harm when he brandished the gun. Claudia and Adrian were not armed when they approached appellant. There was no

11

evidence either of them tried to attack him until *later*, after appellant had hidden the gun in the green truck and Adrian began hitting him. The danger must be "'"'immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" . . . [¶] This definition of imminence reflects the great value our society places on human life.'" (*In re Christian S., supra*, 7 Cal.4th at p. 783.)

Additionally, appellant was not entitled to claim self-defense or defense of Avila because appellant was the initial aggressor and initiated the fracas. He testified he was looking for Prado and intended to beat him up. He knew Prado was at a party such that many people would be gathered. He went into the party with his friends and they immediately attacked Prado. The fight set off a chain reaction in which Ricardo tried to break up the fight, Avila shot Ricardo, and then Avila himself was shot. Appellant testified he was leaving the fray but then decided to turn around and follow Avila back in. Even if appellant reasonably believed he was in imminent danger from Adrian and Claudia, his and his associates' wrongful conduct created the circumstances under which he might have needed to defend himself. (*In re Christian S., supra*, 7 Cal.4th at p. 773, fn. 1.) Moreover, there was no evidence he "fairly notified" Adrian and Claudia he had abandoned the fray. (*People v. Watie, supra*, 100 Cal.App.4th at p. 877.) Appellant was propping up Avila as he brandished the gun. As far as Adrian and Claudia knew, appellant and Avila had brought the gun and turned a celebratory and peaceful gathering into chaos, and the aggressors clearly still had that gun. It was not until later that appellant dropped Avila, disposed of the gun, and tried to run off. Under these circumstances, appellant was not entitled to self-defense or defense of others instructions for assaulting Adrian and Claudia with the gun.

## 2. *Sentencing Enhancement for Personal Use of a Firearm*

Appellant asserts the evidence was insufficient to support the jury's finding that appellant personally used a firearm against Claudia and Adrian. We disagree.

Section 12022.5, subdivision (a), provides "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years . . . ." Imposition of this sentencing enhancement is mandatory when the defendant is convicted of assault with a firearm. (§ 12022.5, subd. (d); *People v. Ledesma* (1997) 16 Cal.4th 90, 98.) Whether a defendant used a firearm within the meaning of section 12022.5 is for the trier of fact to decide, and the jury may draw on circumstantial evidence to make its decision. (*People v. Wilson* (2008) 44 Cal.4th 758, 806; *People v. Cole* (1979) 94 Cal.App.3d 854, 865, disapproved on another ground by *In re Kelly* (1983) 33 Cal.3d 267, 277.)

By using the term "uses" instead of "while armed" in section 12022.5, the Legislature required something more than simply being armed. (*People v. Chambers* (1972) 7 Cal.3d 666, 672 (*Chambers*).)[3] "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm . . . . 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*Ibid.*)

In *Chambers*, the defendant pointed a gun at the victim and demanded money. The California Supreme Court held these facts constituted "use" in the commission of a robbery and satisfied the "use" requirement of the enhancement statute. (*Chambers, supra*, 7 Cal.3d at pp. 672-673.) Still, "[n]othing in the language of section 12022.5(a)

---

[3] *Chambers, supra*, 7 Cal.3d at page 671, footnote 4, involved a prior version of section 12022.5 that stated: "'Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, rape, burglary, or kidnapping, upon conviction of such crime, shall, in addition to the punishment prescribed for the crime of which he has been convicted, be punished by imprisonment in the State prison for a period of not less than five years.'"

13

discloses a legislative intent to limit its application to situations where the gun is pointed at the victim or the defendant issues explicit threats of harm." (*People v. Granado* (1996) 49 Cal.App.4th 317, 322 .) The directive from the *Chambers* court to broadly construe "uses" precludes such a narrow definition of use. (*Ibid*.) Thus, in *Granado*, the appellate court held the defendant had used a firearm for purposes of section 12022.5 when he removed the gun from his waistband, demanded money, and returned the gun to his waistband. (*Granado,* at p. 325.) The court explained that "when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*Ibid*.)

Here, appellant invites us to hold he was merely armed with a gun or passively displaying it, but not using it. We decline the invitation. Substantial evidence supported the jury's determination that he used the gun within the meaning of section 12022.5. Claudia and Adrian both said appellant pointed or aimed the gun at them. This produced a fear of harm in them. They both said they felt frightened by appellant's actions. Adrian told appellant, "Don't shoot." In Claudia's case, appellant held the gun a mere six inches away from her at one point. He told her to "stay away," suggesting he would fire the gun if she came closer. Claudia tried to move his hand away from her direction, but he continued to point the gun at her. She tried to hide against the green truck. Even under appellant's version of the facts, he was holding the gun by its grip with an extended arm while telling people to "get away, get away." As much as he insists he was not "pointing" the gun, appellant's statements describe someone pointing a gun in a menacing manner.

Appellant argues Claudia's testimony cannot be trusted because she unequivocally stated appellant shot her, and the prosecution's own evidence showed that was not possible. The magazine for the FN Herstal pistol had a capacity of 20 cartridges. The magazine still had 16 live rounds in it when found. Three of the FN Herstal's bullets were found in Ricardo. A fourth cartridge was still in the chamber of the pistol. All

14

cartridges were accounted for. Ergo, appellant argues, he could not have shot Claudia with that particular gun. First, regardless of whether appellant actually shot Claudia, his other use of the gun was sufficient to impose the sentencing enhancement. Second, even if someone else shot her, that does not necessarily mean none of the events happened as she described. The undisputed evidence demonstrated at least one other gun, a .40-caliber Smith & Wesson, was in use at the scene. The witnesses described pandemonium once the fighting and shooting started. All the witnesses heard different numbers of shots, and no one could say with certainty exactly how many shots they heard. One could reasonably infer that a stray bullet from the Smith & Wesson found Claudia's arm, and because appellant had a gun pointed at her, she reasonably believed the bullet came from him. Third, and most importantly, it is not for us to judge the credibility of witnesses on appeal. (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) Defense counsel argued to the jury in closing that appellant could not have shot Claudia with the FN Herstal pistol. The jury could have found that, because of this, Claudia was not credible when she described appellant's other conduct. Instead, it convicted appellant of assault with a semiautomatic firearm upon Claudia and found the firearm allegations to be true. The jury was entitled to believe Claudia's testimony that appellant pointed the gun at her. Such credibility determinations are the exclusive province of the jury, and we will not disturb them on appeal. (*Ibid*.) Substantial evidence supported the jury's true finding on the firearm allegations.

### 3. *Correction to Abstract of Judgment*

Appellant lastly contends the abstract of judgment should be corrected as to his conviction on count five. According to the verdict form, the jury convicted him in count five of assault by means of force likely to produce great bodily injury upon Prado. The abstract of judgment states appellant was instead convicted on count five of assault with a deadly weapon ("ASLT W DDLY WPN/INS"). Respondent agrees the abstract of judgment is incorrect and should be amended to reflect the correct offense. This was a clerical error that we may correct on appeal. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we will direct the trial court to file an amended abstract of judgment.

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment that shows appellant was convicted on count five of assault by means of force likely to produce great bodily injury, not assault with a deadly weapon.  The court shall forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

16