Filed 3/5/21  P. v. Gebremariam CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>YONAS TESFAI GEBREMARIAM,<br><br>        Defendant and Appellant. | A159552<br><br>(Sonoma County<br>Super. Ct. No. SCR-699363-1) |

Yonas Tesfai Gebremariam was convicted of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)),[1] attempted voluntary manslaughter (§§ 192, subd. (a), 664), and battery (§ 242) and sentenced to 45 years to life in prison.  Gebremariam appeals, raising several arguments for reversal of his convictions.  We affirm and modify the abstract of judgement.

**BACKGROUND**

**A.**

In December 2016, Gebremariam accused acquaintance Brian Stevenson of stealing $100 from him at a casino.  The two fought physically before security staff separated them.  The following month, at a gathering in

_____

[1] Undesignated statutory references are to the Penal Code.

1

a converted garage where John Rogers[2] and Kendrick Hill lived, Gebremariam and Stevenson met again and appeared to resolve their differences.

A few weeks later, in late January 2017, Stevenson and Gebremariam ran into each other again.  Stevenson testified that he tried to get by Gebremariam, who was standing in the doorway of the Rogers' garage, but Gebremariam told Stevenson to move, used a racial slur, and said he would " 'beat [Stevenson's] ass.' "  Stevenson placed Gebremariam in a neck hold and threw him to the ground, where the two wrestled until Hill pulled them apart.  According to Stevenson, Gebremariam said, " 'I'll fuck you up.  You just got two in the ass.' "

One night in late February 2017, Stevenson arrived at the Rogers' house around midnight.  John, Hill, and Gebremariam's brother were in the garage playing video games.  Stevenson testified that he went outside briefly to smoke a cigarette and make a phone call.

Stevenson testified that he came back inside the garage without incident and, a short time later, saw someone walking down the path outside. He unlocked the door.  Gebremariam opened the door, hitting Stevenson in the back.  Gebremariam said, "what's up now?" and immediately reached for the handle of a gun in his waistband.  Gebremariam raised a semiautomatic, nine-millimeter gun until it was about six inches from Stevenson's stomach, and then fired.

Next, Gebremariam pointed the gun at Stevenson's head.  Stevenson held his hand up, saying " 'don't shoot me.' "  Gebremariam fired again.  The bullet went through Stevenson's hand.  Stevenson collapsed onto a bed,

---

[2] We refer to Rogers family members, for clarity, by their first names.

facedown, pretending to be dead. He heard three more shots fired, and believed he had been shot in the back of his thigh and twice in his buttocks.

Stevenson testified he did not own or carry guns, did not have a gun on the night of the shooting, and never struggled with Gebremariam over the gun.

**B**.

Stevenson's testimony was largely corroborated by his prior statements to police and Hill's testimony. Most importantly, Hill stated that he never saw Stevenson with a gun and did not observe a struggle over the gun before Gebremariam fired the first shot. Hill also said Gebremariam threatened to return with a gun after the January fight.

On the other hand, Hill contradicted Stevenson's denial that he regularly smoked crack. Hill's testimony also conflicted with Stevenson's regarding events immediately before the shooting. Hill said that Stevenson came in and out of the garage several times that night. On one such occasion, Hill heard trash cans falling over. A neighbor also heard two angry, male voices and the sound of metal falling, shortly before hearing gunshots.

Hill testified that, after he heard the noise outside, Stevenson ran back inside the garage, looking frightened, and shut the door. Gebremariam opened it forcefully, pushing Stevenson aside. Gebremariam was holding a gun, which Hill believed was a semiautomatic, nine-millimeter pistol. Gebremariam pointed the gun at Stevenson and said, "you told people you beat me up." Hill then heard a "pop." Stevenson screamed and Gebremariam fired again.

After Stevenson collapsed, Gebremariam was pulled from the room. He returned and shot Stevenson twice more. Hill heard at least four total shots fired. A neighbor, who called 911, also reported hearing four shots fired.

3

## C.

Hill's statements to police were generally consistent with his testimony at trial, although there is some conflict about whether he said that Gebremariam fired the gun twice or at least twice. Inside the garage, police found two shell casings.

The emergency physician who treated Stevenson observed five gunshot wounds: one to Stevenson's lower abdomen, one to each buttock, one to his left inner thigh, and one to his right hand. The doctor believed the minimum number of bullets involved was three.

## D.

John and Harold Rogers testified, for the defense, that Stevenson was a crack addict who was aggressive when using and jealous of Gebremariam's success in the music business. In the summer of 2016, both saw Stevenson with a black semi-automatic pistol. After the January fight, Stevenson yelled, "I'm going to shoot [you]." A week later, Stevenson showed up with a black semiautomatic gun and asked Harold, "where's your boy at?" Neither John nor Harold was present at the scene of the shooting.

Gebremariam himself testified that he headbutted Stevenson after Stevenson stole $100 from him at a casino. Two weeks before the shooting, Gebremariam ran into Stevenson at the Rogers' house. Gebremariam remained angry and still wanted to beat up Stevenson. Gebremariam bumped Stevenson on purpose. Stevenson said, "watch it." Gebremariam threw a punch, and they fought again. When the two were separated, Stevenson said he would pistol whip Gebremariam because "it's not over."

On the night of the shooting, Gebremariam went to the Rogers' house, looking for his brother. When he arrived, Stevenson came outside. Gebremariam told Stevenson that he was "going to get [his] ass whooped

4

again." He saw that Stevenson had a gun, grabbed for it, and the two wrestled for control of the gun, knocking things over in the process. Gebremariam thought Stevenson was going to kill him.

When they moved inside the garage, both Gebremariam's and Stevenson's hands were on the gun. Gebremariam said the gun discharged while Stevenson had both hands on the gun, with one hand on the muzzle. He was not sure who touched the trigger. Despite Stevenson having been shot in the right hand, he continued to use it to fight for the gun. The gun fired a second time, while it was pointed at Stevenson's stomach. Gebremariam admitted his hand may have been on the trigger, but said he never controlled the gun. Stevenson fell after the second shot. No additional shots were fired. Asked to explain the gunshot wounds to Stevenson's buttocks and leg, Gebremariam said the only "logical explanation" was that a bullet "ricocheted off his hand" or they were "ancient wounds."

Gebremariam fled, threw the gun in a creek, drove to San Jose and then, a week later, to Los Angeles. He did not contact the police. When he did speak to police, Gebremariam lied and said he had nothing to do with the shooting.

### E.

Apparently believing Hill's version of events, the jury convicted Gebremariam of one count of assault with a semiautomatic weapon (§ 245, subd. (b); count two), and attempted voluntary manslaughter (§§ 192, subd. (a), 664)—as a lesser included offense to the charged offense of attempted murder (§§ 187, subd. (a), 664; count one). The jury found true enhancement allegations that Gebremariam personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)). Gebremariam was acquitted of a second count of assault with a

semiautomatic firearm against Hill (count three) but convicted of a misdemeanor battery (§ 242; count four).

The trial court found Gebremariam suffered two prior strike convictions (§§ 667, subds. (d), (e), 1170.12, subds. (b), (c)) and two prior convictions for serious felonies (§ 667, subd. (a)). The trial court sentenced him to an aggregate prison term of 45 years to life.

## DISCUSSION

### A.

First, Gebremariam argues his convictions on counts one and two must be reversed because the jury received excluded evidence during its deliberations. We review the question independently (*People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*)), but disagree.

### 1.

At trial, Hill was asked why he was concerned about Stevenson going in and out of the garage on the night of the shooting. Hill said he was worried because Gebremariam brought a gun to the house after the January fight. Immediately thereafter, the court held an admissibility hearing outside of the jury's presence. The court ultimately struck Hill's testimony regarding Gebremariam's prior possession of a gun, concluding it was a separate incident that was more prejudicial than probative. (See Evid. Code, §§ 352, 1101, subd. (b).) The trial court ordered the jury to disregard this testimony and denied Gebremariam's motion for mistrial.

During its deliberations, the jury asked for and was provided a read-back of Hill's testimony. Later the same day, the jury announced it had reached a verdict. Before the court summoned the jury to announce its verdict, the court informed the parties that a substitute reporter had read a transcript to the jury that included Hill's stricken testimony *without* the

6

court's admonition not to consider it.  Relying on its previous admonitions as sufficient to cure any prejudice, the trial court denied Gebremariam's renewed motion for mistrial.

## 2.

It is undisputed that the jury should not have been read Hill's stricken testimony.  The only question "is whether the error was sufficiently prejudicial to warrant a new trial." (*Gamache, supra*, 48 Cal.4th at p. 396.)

No presumption of prejudice arises when a jury innocently considers evidence it was inadvertently given.  (*Gamache, supra,* 48 Cal.4th at pp. 397-399.)  Nor does a jury's innocent consideration of evidence it was inadvertently given constitute constitutional error, as Gebremariam suggests.  (*People v. Clair* (1992) 2 Cal.4th 629, 669, fn. 10.)  "This situation is no different than if the same evidence had been proffered at trial and a valid objection to its admittance was erroneously overruled." (*Gamache, supra*, at pp. 396-397.)  The burden is on Gebremariam to demonstrate a reasonable probability that, in the absence of the error, he would have obtained a more favorable result.  (*Id*. at p. 397; *People v. Jackson* (1996) 13 Cal.4th 1164, 1213-1214.)

## 3.

*People v. Horton* (1995) 11 Cal.4th 1068 (*Horton*) is on point.  In *Horton,* a court reporter read back "the complete trial transcript," without omitting questions to which objections were sustained and answers which were ordered stricken.  (*Id*. at p. 1121.)  Our Supreme Court found the error was not prejudicial because the court "must presume the jury heeded the instruction [to disregard all stricken evidence] . . . , *as it was required to*

*disregard such material when originally presented* during the course of the testimony." (*Ibid*., italics added.)

Gebremariam argues it is unclear if the *Horton* read-back also omitted the court's admonitions to disregard the stricken evidence. If so, it is hard to understand why the court assumed the jury heeded the instruction "when originally presented." ( *Horton, supra,* 11 Cal.4th at p. 1121.) But even without *Horton*, the error is harmless.

Hill's stricken testimony—a single sentence—added little to the overwhelming evidence showing Gebremariam's violent disposition. Both Stevenson *and Hill* testified that, on the day of the shooting, Gebremariam immediately pulled the gun out of his waistband, as he entered the garage, fired at least four times at Stevenson, including two shots fired into Stevenson's backside after he collapsed. The medical evidence and the neighbor's testimony also contradicted Gebremariam's account that only two shots were fired while he was struggling with Stevenson over the gun. Gebremariam's attempts to explain these discrepancies were highly implausible. Gebremariam's behavior after the shooting also allowed the jury to reasonably infer he was not testifying truthfully.

Furthermore, Gebremariam himself testified that he was the aggressor in the prior fights. There was also testimony that he threatened to return with a gun during the January fight. On this record, there is no reasonable probability of a more favorable outcome if the read-back had omitted Hill's stricken testimony.

## B.

Gebremariam insists that the trial court erred in failing to sua sponte give a jury instruction on accident as a defense. (See § 26 (5); CALCRIM Nos.

3404, 510.)  In the alternative, he contends his trial counsel was ineffective in failing to request such an instruction.  He is wrong on both points.

### 1.

A trial court has a sua sponte duty to instruct the jury on general principles of law applicable to the evidence and necessary to the jury's understanding of the case.  (*People v. Estrada* (1995) 11 Cal.4th 568, 574.)  The trial judge has a duty to instruct as to defenses " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' "  (*People v. Breverman* (1998) 19 Cal.4th 142, 157.)  However, the trial court has no sua sponte duty to instruct on accident because it is a pinpoint instruction, which relates evidence to the mental element the prosecution bears the burden of proving.  (*People v. Anderson* (2011) 51 Cal.4th 989, 992, 996-998.)  The trial court is only required to give an accident pinpoint instruction on request.  (*Id.* at p. 997.)

Gebremariam concedes his trial counsel did not request an accident instruction.  Thus, even assuming his testimony regarding the struggle for the gun adequately supported the instruction, Gebremariam cannot show the trial court erred.

Gebremariam argues the rule is different if the accident relates to action elements of a crime (the actus reus), as opposed to the mental element (mens rea).  If he is suggesting that Stevenson was somehow shot as the result of an accident that had nothing to do with Gebremariam's actions—which included, by his own account, fighting for the gun and pulling the trigger—the record does not support his theory.  (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1374.)  In any case, he presents no authority that suggests a sua sponte instructional duty exists when a defendant denies

9

committing the actus reus. Nor does he present any reason why a different rule should apply. (*See Anderson, supra,* 51 Cal.4th at p. 997 [citing commentator's explanation that an accident defense is simply a claim that an element of the crime is missing].)

**2.**

We also reject Gebremariam's ineffective assistance of counsel argument because Gebremariam has not shown that his trial counsel's performance was deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 692.)

A claim of ineffective assistance of counsel raised on direct appeal fails unless "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) However, when counsel does not request jury instructions to support the core of their argued defense, we cannot presume they have made a tactical choice. (*People v. Hussain* (2014) 231 Cal.App.4th 261, 271.)

Here, defense counsel did briefly suggest, in closing argument, that the shooting might have been accidental. However, this was not the core of Gebremariam's defense. Defense counsel primarily argued that Stevenson pulled the gun during a fight and that Gebremariam fired the gun in self-defense. "Homicide is justifiable when committed in self-defense." (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.) And "an accidental shooting is *inconsistent* with an assertion of self-defense." (*Id.* at p. 50; accord, *People v. Sedeno* (1974) 10 Cal.3d 703, 717–718, disapproved on other points by *People v. Breverman, supra,* 19 Cal.4th at pp. 163, 165.)

10

Gebremariam's theory—that the gun discharged accidentally at least *twice* during a struggle for control of the gun that continued even after Stevenson was shot in the hand—is weak. When one also considers Gebremariam's admissions that he was the aggressor in prior altercations with Stevenson, the extensive evidence of Gebremariam's consciousness of guilt, and the wounds to Stevenson's buttocks that Gebremarian could not explain, we agree with the People that defense counsel could reasonably have concluded that it was not wise to divert focus to an accident defense. Because the record fails to affirmatively demonstrate that counsel's omission had no reasonable tactical basis, we reject Gebremariam's ineffective assistance of counsel claim.

## C.

Finally, Gebremariam maintains that the trial court conducted an inadequate investigation into a report of potential juror misconduct. The trial court did not abuse its discretion. (See *People v. Cowan* (2010) 50 Cal.4th 401, 506 [standard of review].)

## 1.

A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. (See U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *Duncan v. Louisiana* (1968) 391 U.S. 145, 149.) Section 1122 requires the trial court to instruct the jury, at each adjournment of the court before the submission of the cause to the jury, "that it is their duty not to . . . converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them." (§ 1122, subd. (b).) A juror who violates this duty, such as by prejudging a case, is guilty of misconduct. (*People v. Linton* (2013) 56 Cal.4th 1146, 1194.)

11

**2.**

In the middle of the prosecution's case in chief, the court received a note from juror 724689, stating that an alternate juror was making comments like " 'this is a shit show,' " " 'yeah, right,' " and that a witness " 'doesn't look like a doctor.' " When summoned, juror 724689 told the court that the alternate made the " 'shit-show' " remark on the first or second day of testimony and continued to make comments as more prosecution witnesses were called. The alternate was seated close to juror 724689 in the courtroom, but the alternate also made at least one comment in the hall, in the presence of some other jurors. Juror 724689 found the comments distracting, but said he was still able to follow the trial and stated that the comments were not leading him to prejudge the case.

The court also questioned the alternate juror, who conceded she might have made at least some of the alleged comments, but only to herself. The court admonished the alternate juror, explaining that the comments were distracting and may influence other jurors to prejudge the case. The alternate juror assured the court she had not made up her mind as to guilt and remained able to deliberate.

Although the prosecutor expressed concern, neither counsel asked to dismiss the alternate or sought further questioning. Defense counsel stated his belief the admonishment was sufficient. The court made no further inquiry.

**3.**

Gebremariam complains that the trial court "had no way of knowing whether [other jurors] had heard comments and responded differently" than juror 724689. The argument is speculative. It assumes that at least one of the other 11 jurors overheard the alternate juror's comments and was

12

unsettled by what they overheard. " ' "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 702.) We cannot find error merely because a trial court's decision to forgo an inquiry leaves some uncertainty about what occurred. (*Id*. at p. 703.)

The trial court did not abuse its discretion. (See *People v. Fuiava, supra*, 53 Cal.4th at p. 702 [" 'wait and see' " approach was not abuse of discretion as to whether any juror other than complaining juror affected by courtroom spectators' actions].) Further inquiry risked tainting jurors who never heard the alternate juror's comments. In any event, the alternate's comments suggested any prejudgment harmed the prosecution, and Gebremariam's trial counsel did not request further inquiry. This "further supports our conclusion that a hearing was not warranted." (*Id*. at p. 703; accord, *People v. Bell* (2019) 7 Cal.5th 70, 120 [defendant forfeited inadequate inquiry claim "by not asking for additional questioning"].)

### D.

Finally, we agree with the People that the abstract of judgment and clerk's minutes do not accurately reflect the trial court's imposition of an aggregate sentence of 45 years to life in prison. Specifically, the abstract of judgment erroneously reflects a total of three years was imposed for the enhancements tied to count two. In fact, the trial court imposed a total of 13 years for enhancements tied to count two. The abstract of judgment and clerk's minutes must accurately reflect the sentence orally pronounced by the trial court. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We will order the superior court clerk to correct the error. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 186-187.)

13

## DISPOSITION

The judgment is affirmed.  The superior court clerk is directed to prepare, and forward to the Department of Corrections and Rehabilitation, an amended abstract of judgment that reflects (1) the trial court's imposition of an aggregate sentence of 45 years to life in prison; and (2) the trial court's imposition of a total of 13 years for enhancements tied to count two.

_____
BURNS, J.

We concur:

_____
SIMONS, ACTING P.J.

_____
NEEDHAM, J.

A159552