[No. B202418. Second Dist., Div. Three. Dec. 12, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTO VARGAS VILLANUEVA, Defendant and Appellant.

### COUNSEL

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul M. Roadarmel, Jr., and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—Defendant and appellant Roberto Vargas Villanueva had an altercation with Evelio Manzano. Later that day, Manzano drove back to the location of their earlier fight, and discovered that defendant was still there. Defendant pulled a gun and told Manzano, who did not exit his van, to leave. Eventually, Manzano put his van in reverse and backed away, but then stopped, and tried to put his van into gear so he could drive away. Defendant shot Manzano, injuring him. Defendant testified that, when Manzano was putting his van into gear, defendant feared that Manzano was going to hit him with the van. However, defendant did not claim that he intentionally fired at Manzano in self-defense. Instead, defendant testified that, while in fear for his life, he stepped back quickly and the gun accidentally discharged. At trial, the trial court denied defendant's request that the jury be instructed on self-defense, and the lesser included offense of attempted voluntary manslaughter on the basis of imperfect self-defense. Defendant was convicted of attempted second degree murder. On appeal, he contends the trial court erred in refusing his requested instructions. We agree, and therefore reverse. Additionally, we conclude the jury should have been instructed on Penal Code section 195, providing that a homicide is excusable when committed by accident and misfortune in the course of doing a lawful act by lawful means, without any unlawful intent; and that brandishing a weapon in self-defense is a lawful act.

## *FACTUAL AND PROCEDURAL BACKGROUND*

The location of the shooting was the parking lot of the Mandarin Deli restaurant. Manzano had previously worked at the Mandarin Deli; he had been fired for drinking on the job. Manzano remained friends with Isidro Vargas, an employee of the Mandarin Deli. He would visit Vargas and drink beer with him outside the restaurant. Other people would sometimes join them, including defendant, who was Vargas's cousin.[1]

The relevant facts involve three encounters between Manzano and defendant on October 6, 2004. On that day, Manzano and defendant drank together in the Mandarin Deli parking lot from 3:00 p.m. to 4:30 p.m. It is unclear who brought the beers, but the men kept the beers in a bucket on the ground. Manzano drank approximately eight or nine beers; he had also consumed some cocaine the night before.[2] Manzano testified that this amount of alcohol

---

[1] Technically, Vargas and defendant were not that closely related, but they referred to each other as cousins.

[2] Manzano testified that he would use cocaine only after drinking 12 beers; this would enable him to keep drinking.

did not render him "falling down" drunk. His former employer testified that when Manzano drank, he spoke louder and acted more "macho." Defendant testified that he had known Manzano to have gotten into fights. Manzano testified that defendant drank as much as he did that afternoon. Manzano left the Mandarin Deli at 4:30 p.m. to return to his job at another nearby restaurant.

Around 5:30 p.m., Manzano returned to the Mandarin Deli. While the facts of this encounter were highly disputed, this much is clear: (1) Manzano tried to take more beer from the bucket; (2) defendant tried to stop him from taking the beer; and (3) the two fought verbally and physically.

According to Manzano, he took one beer and drank it while defendant also drank. When Manzano reached for a second beer, defendant pushed him away. Manzano asked "What's wrong with you?" and defendant pushed him again. Defendant tried to kick Manzano; Manzano grabbed defendant, and defendant fell. At this point, according to Manzano, Vargas came outside and told him to leave; Manzano left.

According to defendant, when Manzano reached for a beer, defendant told him they could not drink there anymore. (Defendant testified that Vargas's boss's wife had seen them drinking earlier, and defendant did not want Vargas to get into trouble.) Manzano ignored defendant and grabbed a beer anyway. Defendant took the beer from him and put it back in the bucket. Defendant stood between Manzano and the beer. Manzano pushed him away, and defendant pushed back. The pushing escalated, and Manzano fell. Manzano then punched defendant on the forearm, and defendant fell. Vargas then told Manzano to leave. Before leaving, Manzano said to defendant, "You better watch your back because the next time I see you I'm going to kill you, m-----f-----."

Vargas testified that he did not see the fight until one of his friends told him that the two men were fighting in the parking lot. Vargas saw them both throwing blows, but saw neither man fall. He told them to break it up, calm down, and leave. Defendant and Manzano went off in separate directions.

An unrelated eyewitness, Archie Kelly, was walking in the alley behind the Mandarin Deli parking lot, and also saw the fight. He heard the men arguing in Spanish, but could not understand what they were saying. Kelly clearly believed one of the two men was more aggressive than the other; he appeared enraged, while the other man seemed to be gesturing to leave the matter alone. However, Kelly's testimony was ambiguous as to which of the two

men was the aggressor. Kelly was positive that the man who came out of the restaurant (which would have been defendant) was more aggressive than the man who drove up in the van (which would have been Manzano). However, when Kelly saw defendant in court, he was equally positive that defendant was the more peaceful of the two, and gave a physical description of Manzano as the one who was the aggressor.[3]

Manzano next returned to the Mandarin Deli after work, at 9:30 p.m. According to Manzano, he was going to ask another Mandarin Deli employee for a ride to work the next day, as his van was not working properly. That employee testified that he barely knew Manzano, and had only seen him twice before. In any event, it is undisputed that Manzano, for whatever reason, drove to the Mandarin Deli at 9:30 p.m. Defendant, who had made plans with Vargas for that night, was waiting in the parking lot for Vargas to finish work. As with the earlier incident, the facts of this encounter were highly disputed. The following facts, however, were clearly established: (1) Manzano parked his van in the parking lot; (2) at some point, defendant went to his car and obtained a gun; he loaded the gun and chambered a round; (3) defendant approached Manzano's van and told him to leave; (4) Manzano shifted into reverse and moved his car back a bit; (5) Manzano then attempted to shift his car into gear to drive forward; (6) at this point, defendant shot Manzano.

According to Manzano, when he entered the parking lot, defendant came toward him and asked what he wanted. Manzano said he had come to talk to someone else. Defendant replied, "You're not going to talk to anyone because I'm going to kill you," and cursed at Manzano. Manzano thought that if defendant wanted to fight, Manzano would fight. He turned his van so that he could exit and fight defendant. During this time, defendant went to his car and obtained the gun. Defendant came back and pointed the gun at Manzano, who was still in his van, and asked, "What's wrong with you?" Manzano tried to calm defendant. Eventually, he heard defendant tell him to leave, so he put his van in reverse and started backing out. Defendant continued to curse at him and threaten to kill him if he did not leave. As Manzano shifted his car forward so that he would not hit a parked car, defendant shot him.

According to defendant, he was terrified of Manzano when Manzano drove into the parking lot, as Manzano had threatened his life a few hours earlier. Defendant saw Manzano make a move toward the glove compartment of his van, and feared that Manzano was arming himself with a gun. Defendant then

---

[3] In other words, Kelly was absolutely certain that defendant was the driver of the van—a fact which is indisputably false.

went to his own car and armed himself. Defendant then repeatedly asked Manzano to leave; Manzano did not. Finally, defendant saw Manzano play with the gearshift of his car; defendant thought Manzano was pretending that he was having trouble shifting gears, and was planning some sort of attack on defendant. Manzano drove in reverse a short distance, then stopped. Defendant asked Manzano what he was waiting for and why he did not just leave. Defendant begged Manzano to leave, saying, "Please, leave. I don't want to hurt you. I don't want to kill you." Manzano again did not move. Defendant, who had previously been standing behind his open car door for protection, approached Manzano, thinking that maybe if he got closer to Manzano, it would frighten Manzano into leaving. Defendant approached the passenger side of Manzano's van, standing somewhat forward of Manzano, and again pleaded with Manzano to leave, and threatened to shoot him if he did not. Manzano then said, "I was born to die," and then stepped on the accelerator as if he were going to run defendant over. Defendant stepped back quickly so that he would not be hit, and the gun fired. Defendant fled the scene. He was not apprehended for a year and a half.

Manzano was interviewed by police in the hospital a few days after the shooting. At that time, he told police that he did not immediately leave after defendant told him to do so. Instead, when defendant said he would kill Manzano if Manzano did not leave, Manzano had replied, " '[T]oo bad.' . . . 'If you are anybody to take my life away, then do it, but I'm not doing anything to you.' "[4]

Manzano suffered facial injuries from the bullet wound. Half of his face is paralyzed; he has substantial nerve damage and has lost his hearing in one ear. Doctors determined that Manzano's blood-alcohol level, after the shooting, was 0.197. He also had cocaine in his system.

Defendant was charged by amended information with the attempted murder of Manzano. (Pen. Code, §§ 664, 187.) He was also charged with mayhem. (Pen. Code, § 203.) With respect to both charges, it was further alleged that defendant personally used a firearm (Pen. Code, § 12022.53, subd. (b)); intentionally and personally discharged a firearm (Pen. Code, § 12022.53, subd. (c)); intentionally and personally discharged a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)); personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)); and personally inflicted great bodily injury which caused the victim to become comatose or suffer paralysis of a permanent nature (Pen. Code, § 12022.7, subd. (b)).

---

[4] Manzano also told police that he had apologized for what had happened earlier, and that defendant said he did not want any apologies.

Defendant pleaded not guilty and the matter proceeded to a jury trial. Throughout the course of the trial, prior to defendant's testimony, defendant's counsel proceeded on the basis that defendant was pursuing the defense of self-defense. Defense counsel's opening statement to the jury was based on self-defense, and he argued pretrial motions on that basis.[5]

However, after defendant testified that he had fired the gun accidentally, the trial court refused defendant's request to instruct the jury in the language of self-defense (CALCRIM No. 3470) and voluntary manslaughter by means of imperfect self-defense (CALCRIM No. 604). The trial court conceded that perhaps defendant had *armed himself* in self-defense, but, in the absence of any testimony that defendant *fired* in self-defense, there was no basis for the requested instructions. The trial court stated that there were no facts from which self-defense could be inferred.

During deliberations, the jury submitted several questions. Relevant to our purposes, the jury sought the definition of "intentional" with respect to Penal Code section 12022.53, subdivision (d), the sentence enhancement for intentionally and personally discharging a firearm causing great bodily injury. The court responded, "This means that the defendant must have specifically intended to discharge the firearm."

Thereafter, the jury returned verdicts finding defendant guilty of attempted murder and mayhem. The allegations that defendant personally used a firearm and personally inflicted great bodily injury were found true. However, the jury was unable to reach a verdict on whether defendant personally and intentionally discharged a firearm, or personally and intentionally discharged a firearm causing great bodily injury.[6] The trial court declared a mistrial on the two enhancement allegations on which the jury had failed to reach verdicts.

Defendant sought a new trial on the basis that the trial court erred in not instructing the jury on self-defense. In denying the motion, the trial court

---

[5] Indeed, before trial, the prosecution sought to admit evidence to show that defendant was familiar with guns and would not have fired by accident. Defense counsel responded, "None of the proposed bases of relevance are really at issue in this trial. No one is claiming that the gun was fired by accident." After defendant testified that the gun was fired by accident, the prosecution was permitted to pursue this line of inquiry. Defendant testified that he had owned the gun for more than five years, and had fired it on two occasions, shooting at targets.

[6] Although the jury had been instructed to determine whether the attempted murder was committed willfully, with premeditation and deliberation, the verdict forms supplied to the jury did not seek such a finding, and the jury did not resolve the issue. Similarly, although the jury had been instructed on the allegation of personal infliction of great bodily injury which causes the victim to become comatose or suffer paralysis, the verdict forms did not seek a finding on this allegation.

indicated that it had refused the self-defense instruction not simply because defendant had testified that the shooting was accidental, but because there was no substantial evidence that defendant had shot Manzano in self-defense.

Defendant was sentenced to 20 years in prison, calculated as the seven-year midterm for attempted murder, plus 10 years for the personal use of a firearm, plus three years for the infliction of great bodily injury. The sentence on mayhem was stayed under Penal Code section 654. Defendant filed a timely notice of appeal.

## ISSUES ON APPEAL

We consider whether the trial court erred in failing to instruct the jury on the defense of self-defense, and the lesser included offense of (attempted) voluntary manslaughter by means of imperfect self-defense. We also consider the proper instructions to be given a jury when the defendant relies on the defense of accidentally shooting the victim while brandishing a weapon in self-defense.

### 1. Duty to Instruct Sua Sponte

A trial court must instruct the jury sua sponte on general principles of law applicable to the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) This requirement includes instruction on lesser included offenses supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) A trial court is required to instruct sua sponte on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case. (*People v. Sedeno, supra*, 10 Cal.3d at p. 716.) If the defense is supported by the evidence but is inconsistent with the defendant's theory of the case, the trial court should instruct on the defense only if the defendant wishes the court to do so. (*People v. Elize* (1999) 71 Cal.App.4th 605, 611–612 [84 Cal.Rptr.2d 35].)

Of course, even if the defendant requests instruction on a defense, the trial court need not give the instruction if it is not supported by substantial evidence. (*People v. Sedeno, supra*, 10 Cal.3d at p. 718.) In determining whether substantial evidence supports a defense, the trial court must leave issues of witness credibility to the jury. (*People v. Elize, supra*, 71 Cal.App.4th at p. 615.)

### 2. Self-defense

Homicide is justifiable when committed in self-defense. (Pen. Code, § 197, subd. 1.) CALCRIM No. 3470, the self-defense jury instruction,

provides, in pertinent part, "The defendant acted in lawful [self-defense] if: [¶] 1. The defendant reasonably believed that [he] was in imminent danger of suffering bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."[7]

The question arises as to whether an *accidental* shooting can be committed in self-defense. In other words, can a defendant claim self-defense if the defendant pointed the weapon at the victim in self-defense, but fired accidentally? When the defendant did not intend to shoot the victim, can such an unintentional act be considered self-defense?

It appears to be decided that an accidental shooting is *inconsistent* with an assertion of self-defense. (*People v. Sedeno, supra*, 10 Cal.3d at pp. 717–718 [defendant's claim that the gun fired accidentally during a struggle is inconsistent with self-defense]; *People v. Elize, supra*, 71 Cal.App.4th at p. 610 [defendant can only receive a self-defense instruction if the jury *disbelieved* his assertion that the shooting was accidental]; *People v. Curtis, supra*, 30 Cal.App.4th at p. 1357 ["self-defense imports an intentional shooting; it does not apply to an accidental one"]; *People v. Mayweather* (1968) 259 Cal.App.2d 752, 755 [66 Cal.Rptr. 547] [defendant grabbed a gun he thought the victim was trying to reach to use against him; defendant's claim that the gun fired accidentally is not consistent with self-defense]; *People v. Slater* (1943) 60 Cal.App.2d 358, 367 [140 P.2d 846] [defendant who claimed to have fired either accidentally or a warning shot did not act in self-defense].[8])

As explained by Division Two of the Fourth Appellate District, "[D]efendant does not argue that there was evidence of traditional self-defense, as such. Rather, he argues that there was evidence that the homicide occurred by accident while he was *armed* in traditional self-defense. In some jurisdictions,

---

[7] A killing that would otherwise constitute murder is reduced to voluntary manslaughter if the defendant killed a person while acting in imperfect self-defense. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1354–1355 [37 Cal.Rptr.2d 304].) The difference between the defense of self-defense and the lesser included offense of voluntary manslaughter by means of imperfect self-defense is that, in the latter, the defendant's belief in the need to use deadly force is unreasonable. (CALCRIM No. 571.) In this case, we consider self-defense and imperfect self-defense somewhat interchangeably, as the key issue in dispute is whether defendant acted *intentionally*. There is clearly evidence that renders the issue of the reasonableness of defendant's belief in the need to use deadly force a jury question in this case. Thus, if defendant was entitled to instruction on either self-defense or imperfect self-defense, both instructions should have been given.

[8] The court in *Slater*, however, somewhat paradoxically concluded that the jury should have been instructed on defense of habitation. (*People v. Slater, supra*, 60 Cal.App.2d at pp. 367–369.)

this claim would invoke the hybrid defense of accidental homicide in the exercise of self-defense. [Citations.] The defendant would be entitled to jury instructions on both self-defense and accident. [Citation.] Under the law of these jurisdictions, however, it appears that self-defense does not require the intentional use of deadly force. [Citations.] [¶] By contrast, in jurisdictions which—like California—hold that self-defense and accidental homicide are mutually exclusive, a defendant who claims to have killed by accident while defending him or herself is not thereby entitled to jury instructions on self-defense. [Citations.]" (*People v. Curtis, supra,* 30 Cal.App.4th 1337, 1358.)

■ The question next arises as to whether substantial evidence of self-defense can exist in a case where the defendant has affirmatively testified that the shooting was accidental. While there are some statements in the case law to the contrary,[9] the bulk of the authority is that a defendant's assertion of accident *may be* disregarded by the jury in an appropriate case, and will not foreclose jury instruction on self-defense when there exists substantial evidence that the shooting was intentional (and met the other requirements of self-defense). (*People v. Barton* (1995) 12 Cal.4th 186, 202–203 [47 Cal.Rptr.2d 569, 906 P.2d 531] [finding sufficient evidence of intentional shooting in imperfect self-defense despite the defendant's assertion that the shooting was accidental]; *People v. Elize, supra,* 71 Cal.App.4th at p. 610 ["A jury . . . could disbelieve defendant's testimony that the firing was accidental, and decide instead that he had fired intentionally, either actually attempting to hit one of the [assailants] or to shock them into breaking off their attack."]; *People v. Curtis, supra,* 30 Cal.App.4th at p. 1355;[10] *People v. Mayweather,*

---

[9] For example, in *People v. Sedeno, supra,* 10 Cal.3d at page 718, the Supreme Court stated, "It is not error to refuse a request for instructions on self-defense when there is no evidence from which it can be inferred that the defendant feared great bodily harm or death at the hands of the victim, *or when the defendant has denied acting in self-defense and claimed the death was accidental.*" (Italics added.) As the *Sedeno* court also concluded there was no evidence to support the claim of self-defense (*id.* at p. 717), the italicized language can be construed as dicta.

[10] In the notes following CALCRIM No. 510, the jury instruction for excusable homicide committed by accident, there is a note stating that in *People v. Curtis,* "the court held that the claim that a killing was accidental bars the defendant from relying on traditional self-defense . . . as a defense . . . ." (The note goes on to disagree with this purported holding in light of the more recent authority of *People v. Elize, supra,* 71 Cal.App.4th 605.) We disagree with this interpretation of *People v. Curtis.* In that case, the court recognized the legal proposition that while a defendant's assertion of accident is inconsistent with imperfect self-defense, the jury could reject the defendant's testimony and find an intentional shooting in imperfect self-defense. The court simply found no evidence of an intentional shooting in imperfect self-defense in that case. (*People v. Curtis, supra,* 30 Cal.App.4th at pp. 1355–1356.) The facts of *People v. Curtis* were somewhat unusual. The victim went to the defendant's apartment alone to discuss her accusation that the defendant, her former paramour, had stolen her car. The victim was not truly alone; several of her family members came with her and

*supra*, 259 Cal.App.2d at p. 756 [jury could have found a volitional shooting in self-defense despite defendant's assertion of accident].)

█  We therefore turn to the main issue on this appeal: whether there was sufficient evidence that defendant intentionally shot Manzano in self-defense, despite defendant's assertion that he shot Manzano accidentally. We believe that there was. It is undisputed that defendant and Manzano had fought earlier and that their confrontation had become physical. It is also undisputed that Manzano was highly intoxicated at the time, and still had cocaine in his system. The jury could have accepted Kelly's identification of defendant as the party attempting to peacefully end the dispute. Defendant testified that Manzano had threatened to kill him the next time they met. He also testified that when Manzano returned to the Mandarin Deli, Manzano appeared to reach in his glove compartment for a weapon. Defendant testified that, once he had armed himself in response, he begged Manzano to leave, and said that he would shoot Manzano if he did not. Manzano himself had told police that he did not immediately leave, but instead told defendant, "If you are anybody to take my life away, then do it." Defendant continued pleading with Manzano to leave, and only shot him after Manzano had said "I was born to die," and stepped on the accelerator in an apparent attempt to run defendant over. The jury could have concluded that defendant, fearing that he would be hit by Manzano's van, intentionally shot Manzano in self-defense.[11] As there was sufficient evidence of self-defense, and defendant requested the instruction, the trial court was required to give the instruction. Similarly, there was sufficient evidence of the lesser included offense of attempted voluntary

waited outside the door. When they knocked on the defendant's door asking to see the victim, the defendant shot the victim. Unbeknownst to the defendant, the victim had hidden a voice-activated tape recorder in her purse, in the hopes of recording the defendant's admission that he had stolen her car. Thus, an audio recording of the shooting was available. Just prior to the fatal shot, the victim could be heard pleading with the defendant to drop the gun and not shoot her. (*Id.* at pp. 1345–1348.) On appeal, the defendant did not assert that there was evidence of traditional self-defense. (*Id.* at p. 1358.) He did, however, assert that there was evidence of imperfect self-defense. (*Id.* at p. 1354.) Assuming, without deciding, that there was sufficient evidence that the defendant believed he was in imminent danger, the court concluded there was insufficient evidence that the defendant intentionally shot *the victim* in self-defense. While the defendant may have perceived danger from the victim's family members outside his door, there was no evidence that he perceived such danger from the victim. (*Id.* at pp. 1355–1356.) Forensic evidence indicated that she was sitting or kneeling at the time of the shooting, and the tape recording demonstrated that she was begging him not to shoot her. (*Id.* at pp. 1348, 1356.) Given this evidence, the defendant either shot the victim accidentally, or intentionally and not in self-defense. (*Id.* at p. 1357.)

[11] As the court noted in *People v. Elize*, the fact that defendant was convicted—in this case, of attempted murder—indicates that the jury believed that he had fired the gun intentionally. (*People v. Elize, supra*, 71 Cal.App.4th at p. 610.) Indeed, the prosecution's evidence that defendant had possessed the gun for more than five years and had previously used it for target shooting suggests that defendant was familiar with the weapon and would not have discharged it accidentally.

manslaughter by means of imperfect self-defense, and the trial court erred by not instructing the jury on this lesser included offense.

We next consider whether the error was prejudicial. We review an error of misdirection of the jury for a miscarriage of justice, and do not reverse unless it appears reasonably probable that the defendant would have achieved a more favorable result had the error not occurred. (*People v. Breverman, supra,* 19 Cal.4th at p. 149; *People v. Elize, supra,* 71 Cal.App.4th at p. 616.) In this case, reversal is necessary. There were only two witnesses who testified to the circumstances of the shooting: Manzano and defendant. Neither gave inherently incredible testimony; and, in fact, Manzano's testimony was questionable in several respects. Specifically, Manzano's testimony that he returned to the Mandarin Deli to ask a virtual stranger for a ride to work is somewhat difficult to believe. Additionally, Manzano admitted that, during the course of the encounter, he had planned to get out of the van and fight defendant, and he told police that he had told defendant, "If you are anybody to take my life away, then do it." The jury could have believed Manzano was looking for revenge, and that defendant intentionally shot him in self-defense when he refused to leave, and appeared instead to be planning to hit defendant with his van. With the evidence evenly balanced, we conclude the error was prejudicial and requires reversal.

### 3. *Accident*

As we have discussed above, when a defendant draws a weapon in self-defense, but fires accidentally, the shooting itself is not considered self-defense. Instead, it is an accident. In this case, the jury was instructed in the language of CALCRIM No. 3404 as follows: "The defendant is not guilty of the crimes charged if he acted without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of the crimes charged unless you are convinced beyond a reasonable doubt that he acted with the required intent." While this instruction is a correct statement of the law, and defendant did not request any further instruction on the issue of accident, we believe more specific instructions were appropriate under the factual circumstances of this case.

Penal Code section 195 provides, in pertinent part, that a homicide is excusable "[w]hen committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." (Pen. Code, § 195, subd. 1.) Penal Code section 417, subdivision (a)(2) provides, "Every person who, *except in self-defense,* in the presence of any other person, draws or exhibits any firearm, whether

loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel [commits the offense of brandishing] . . . ." (Italics added.) In other words, a homicide is excusable when a defendant accidentally kills while brandishing a weapon in self-defense, if the defendant acted with usual and ordinary caution.[12]

■ When a murder defendant relies on the theory that the homicide was committed by accident while the defendant was lawfully acting in self-defense without any unlawful intent, the jury should be instructed on excusable homicide. (*People v. Slater, supra,* 60 Cal.App.2d at p. 369.) There is no reason why this should not also apply to a charge of attempted murder, when the defendant relies on a similar claim of accident during the course of lawful self-defense. The instruction appears particularly necessary in this case, given the jury's apparent confusion on the issue of defendant's intent. Although the jury convicted defendant of attempted murder and therefore found an intent to *kill*, the jury had been unable to find that defendant intended to *shoot*. After the jury was told that the "intentional" element of Penal Code section 12022.53, subdivision (d) required a finding that "the defendant must have specifically intended to discharge the firearm," the jury was unable to reach a verdict on that enhancement allegation, instead finding true only the allegation that required defendant to have intentionally *used* the firearm.[13] While we do not speculate as to the jury's rationale, we simply acknowledge the fact that the jury's inability to reach a verdict on the two intentional discharge of a firearm enhancements indicates that the jury struggled with the issue of whether defendant discharged an intentionally drawn firearm accidentally. This underlines the necessity of the excusable homicide and brandishing instructions in this case. Thus, on retrial, if defendant again relies on a claim of accident in the course of self-defense, the trial court should instruct the jury on excusable homicide (CALCRIM No. 510) and brandishing, including that brandishing in self-defense is lawful (CALCRIM No. 983).

---

[12] If the act is done in a criminally negligent manner, the homicide is involuntary manslaughter. (Pen. Code, § 192, subd. (b); *People v. Orr* (1994) 22 Cal.App.4th 780, 784 [27 Cal.Rptr.2d 553].) However, we are here concerned with a charge of attempted murder, not murder. An attempt to commit a crime requires a specific intent to commit the crime. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710 [5 Cal.Rptr.3d 256].) Thus, there can be no crime of *attempted involuntary manslaughter*. If a defendant brandished a weapon in self-defense, but in a criminally negligent manner, and shot but did not kill the victim, the accidental (attempted) homicide excuse would not apply, but the crime would not be attempted involuntary manslaughter.

[13] The jury was instructed in the language of CALCRIM No. 3146 that it could find the personal use enhancement true if defendant intentionally displayed the firearm in a menacing manner.

## *DISPOSITION*

The judgment is reversed and the matter remanded to the trial court for retrial in a manner consistent with this opinion.

Klein, P. J., and Aldrich, J., concurred.