Filed 12/29/23  P. v. McVoy CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B317535 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA105677) |
| v. | |
| JOHN KEVIN McVOY, JR., | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Viet H. Nguyen, Deputy Attorneys General for Plaintiff and Respondent.

_____

A jury convicted defendant John Kevin McVoy, Jr., of one count of second degree murder, a lesser offense to the charged crime of premeditated first degree murder.  (Pen. Code, § 187.)[1] The jury also found true an allegation that defendant personally and intentionally used a firearm.  (§ 12022.53, subd. (c).)  The court sentenced him to prison for 35 years to life.

On appeal, defendant makes the following contentions: (1) The court failed to instruct on transferred self-defense; (2) The court failed to instruct on voluntary manslaughter; (3) The court made a statement to the jury that had the effect of directing a verdict on the issue of malice; (4) If the court's instructional errors did not separately require reversal, the cumulative prejudicial effect of them does; (5) If defense counsel forfeited any argument concerning instructional errors by failing to object, defendant was denied the effective assistance of counsel; (6) There is insufficient evidence to support the finding of malice; and (7) A further sentencing hearing is required to allow the court to exercise its discretion to strike or reduce the gun enhancement.  We reject these contentions and affirm the judgment.

### FACTUAL SUMMARY AND PROCEDURAL HISTORY

#### A.    Prosecution Evidence

Victor Garcia, Ramon Chavarria, and Richard Muno were musicians in an "alternative new metal" band called, Below the

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Fault Line.[2]  During the last few months of 2016 they ordinarily met on Tuesday evenings to practice in Victor's garage.

Defendant was a musician who worked in the music retail business selling guitars.  He promoted his business by sponsoring local bands and supplying bands with musical gear at no cost to the bands.  He had known Victor and Muno since 2011 or 2012.

In September or October 2016, defendant began attending Below the Fault Line's Tuesday practice sessions in Victor's garage.  He did not play an instrument, but did bring beer and "weed."  Victor and Muno had developed an instrument with a synthesizer pad attached to a guitar frame, and in late November 2016, they invited defendant to play the instrument in the band.  According to Muno, the instrument "was unnecessary" and defendant's role in the band was not very important.  The new instrument was never fully developed, and defendant never played it with the band.

A practice session for the band was scheduled for January 10, 2017.  At about 5:20 p.m., Miguel Rea, a friend of Victor's, arrived at Victor's home with a bottle of whiskey.  Victor and Rea drank some whiskey.  A short time later, Victor's wife Susan arrived at the home with their two-year-old son, R.G.  Susan had a mixed whiskey drink.

Chavarria arrived at Victor's house at about 7:00 p.m.  He sat at a table to the right of Susan, who held R.G.  Rea sat at the table across from Chavarria.  Victor was standing at the edge of the table near Susan.

---

[2] Because Victor Garcia and the victim Susan Garcia share a last name, we will refer to them by their first names to avoid confusion.  No disrespect is intended.

3

A television was on in the house and President Obama was making a speech. Victor, Chavarria, and Rea talked about politics and the recent election. Chavarria and Rea teased Victor about saying he voted for Donald Trump. They were in a "happy" mood, "joking around, poking fun at each other."

Defendant arrived at the house at about 7:15 p.m. He had a loaded .41 caliber revolver hidden in the waistband in the back of his pants.[3] Chavarria offered defendant a chair, but defendant remained standing and paced around the room. Rea asked defendant about defendant's motorcycle.

According to Chavarria and Rea, Victor was talking about President-elect Trump and said something like, "That's what I hate about White people." Victor said this in a "joking" and "playful" way. Victor asked the others whom they voted for. Chavarria said he did not vote. Defendant said he voted for "Hillary Clinton." Victor then snapped his fingers, pointed to the door, and told defendant, in a "friendly," "joking" way, " 'Get the fuck out of my house.' " Victor, Chavarria, Rea, and Susan laughed. At no point did Victor threaten defendant in any way.

Defendant stood between Victor and Rea, and across the table from Susan. He pulled the gun from his waistband and shot Victor in the left side of his head.[4] Just before or as

---

[3] The gun was manufactured sometime between 1877 and 1909. Defendant described it as a family heirloom.

[4] None of the prosecution witnesses saw defendant fire the shot that hit Victor. Chavarria testified that he looked down to grab a bottle of water to drink during the "split second" that defendant drew his gun and fired. Rea was facing Chavarria and Susan, with his back to defendant. Victor, who testified after

4

defendant fired the shot, Susan yelled, "Victor." Victor fell to the floor, and defendant turned and pointed the gun at Susan. Susan, who had been holding R.G. in her lap, turned sideways to protect her child. Within two or three seconds after shooting Victor, defendant fired the gun at Susan, killing her.

After the second gunshot, Rea grabbed defendant's hand or arm, and the gun fell to the floor. Rea tackled defendant, and struggled to restrain him until police arrived. As they fought, Rea asked defendant, " 'What did you do?' " According to Rea, defendant responded, " 'Jihad,' " " 'Jihad.' "

As Rea and defendant fought, they slid along the floor from the living room into a hallway. Defendant attempted to gouge Rea's eye, and Rea punched defendant repeatedly. Meanwhile, Chavarria picked the gun up off the floor, took it outside the house, and called 911. Police officers arrived about five minutes later.

The next morning, detectives interviewed defendant in the hospital. He admitted shooting Victor, and explained, "[T]hey kind of came at me so I didn't know what to do." Defendant further explained to the detectives that he brought his gun to the house because he felt threatened and scared by the band members and was afraid that if he did not join their band, they would kill him. When he arrived, "they were talking about . . . how much they hated White people," and wanted to "kill [him] and kill White people."

---

undergoing several brain surgeries related to the shooting, recalled "being hit in the back of the head," but did not realize at the time that he had been shot.

At trial, defendant explained that although he repeatedly used the word "they" during his police interview, he did not "know why [he] kept saying 'they.' Because it wasn't a multiple-party thing. It was just Victor."

When a detective asked defendant if he shot anyone else, he replied, "No, not intentionally, I mean I just was scared—I didn't know, I was defending myself." After a detective informed him that he shot Susan, defendant explained that the gun is "a revolver[,] so [he] just pulled the trigger twice. It wasn't like I was like aiming at her like that[,] so I don't know." Later, he reiterated that his shooting of Susan "wasn't intentional."

An expert on gunshot residue testified that defendant had particles on his hands that were characteristic of gunshot residue, indicating that he may have discharged a firearm. Rea and Chavarria did not have particles characteristic of gunshot residue on them, making the tests on them "inconclusive." They did, however, have particles that indicated they "may have been in the environment of gunshot residue."

### B.    Defense Evidence

Defendant testified. He stated that in the fall of 2016, Victor invited him to check out his new band, and later asked him to join. In November 2016, the band signed a sponsorship agreement with a company that agreed to provide "straps" for the band with the company's logo. After entering into the sponsorship agreement, Victor became more demanding, "bossy," and argumentative.

Defendant described three incidents prior to January 2017 when he felt threatened by Victor. On the first occasion, Victor referred to drowning defendant in his backyard pool. In the second incident, Victor said he was going to fry a turkey for

6

Thanksgiving, and told defendant, " 'I would hate for you to leave the band. We would have to fry you up and eat you.' " The third incident occurred in early December, when Victor showed him a shotgun in his house and said, " 'I would hate to see you leave the band or [I] might have to use a shotgun on you.' "[5]

Defendant testified that he brought his revolver with him to Victor's house on January 10, 2017, because he was planning to quit the band and was afraid that Victor would "pull[] a shotgun on [him]." Defendant did not plan to shoot the gun that night.

When defendant arrived at Victor's house, he observed that Victor was drunk and "belligerent." President Obama was speaking on the television and Victor was making statements, such as, " 'I want to kill all of the White people,' " and " 'I hate White people.' " Defendant was "the only White person in the room."

After defendant said he voted for Hillary Clinton, Victor said, " ' [G]et the fuck out of my house.' " Although defendant "laughed it off" and "thought [Victor] was joking around with his friends," "[i]t was still in an angry tone." Victor then told defendant, " 'It's White people like you who should die,' or 'White people like you that we should kill, White boy' " and " 'White people like you that make this world a piece of shit.' "

---

[5] On cross-examination, defendant stated that the third threatening incident, where Victor showed defendant his shotgun, occurred before a practice session at Victor's house on December 6 or December 13, 2016. There were no meetings at Victor's house between the December 13 session and January 10, 2017. The prosecution introduced uncontradicted evidence showing that Victor acquired the shotgun on December 16, 2016.

Victor picked up what defendant thought was a knife from the table and walked aggressively toward defendant yelling, " 'I'm going to fuck you up.' " Defendant pulled the gun from his waistband, cocked the hammer, and told Victor to "back off." When Victor "was reaching above" defendant, defendant fired the gun at Victor. Defendant later realized that the object Victor picked up from the table was a can opener.

After shooting Victor, defendant thought that Rea might also try to attack him. He cocked the hammer on the gun and started to tell Rea to "back the fuck off," but before he could finish, Rea grabbed his arm or hand, causing the gun to point at Susan. Defendant did not point the gun at Susan intentionally. During their struggle, the gun fired. The gun fell to the floor, and Rea tackled defendant to the ground and started hitting him. Rea asked him why he did it, and defendant responded, "No gun. I have no gun. And he was going to hit me. He was going to hit me." He denied saying, "Jihad." Rea punched him "at least 50, maybe [100 times]" for about 20 to 30 minutes.

On cross-examination, defendant used a replica of a gun to demonstrate how Rea grabbed his hand as the gun fired the shot that hit Susan. He held the replica in his right hand and used his left hand to show how Rea's left hand was placed. As the court described it, the fingers of the left hand were over defendant's right "hand, the wrist, and the top of the gun."

### C. Rebuttal and Surrebuttal Evidence.

In the prosecution's rebuttal case, a criminologist testified that if Rea had grabbed defendant's hand in the manner defendant had demonstrated, the firing of the gun would have caused burn marks or stippling on Rea's hand. Rea testified that

8

he had no burn marks on his hand.  He further testified that he did not see Victor threaten defendant with any weapon.

In the defense surrebuttal case, defendant testified that, as he and Rea struggled over the gun just before Susan was shot, Rea "was grabbing mostly my hand," and Rea's hand "wasn't covering any part of the gun that would move, certainly not the hammer or the cylinder."

Additional facts will be included in the discussion below.

### D.    Procedural History

Defendant was charged by information with first degree premeditated murder (count 1; § 187), two counts of attempted murder (counts 2 & 3; §§ 187, 664), and one count of child abuse under circumstances likely to cause great bodily injury or death (count 4; § 273a, subd. (a)).  The information further alleged that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), causing great bodily injury and death (*id.*, subd. (d)).

During a preliminary discussion with counsel regarding jury instructions, the court raised the possibility of instructing on the theory of transferred self-defense with respect to count 1— the murder of Susan.  After the close of evidence, the court indicated it would not give the instruction.  The prosecutor, however, questioned the omission because there might have been "a transfer[red] intent between [Rea] and Susan."  The court explained that it would not include the instruction because it "did not hear [defendant] say that he intended to shoot [Rea].  What I am hearing is that he pointed it but he had no intent in shooting him.  So it wasn't an intent to kill and that transferred to Susan. It was[,] it's accidental.  It was a struggle.  I'm not hearing any intent."  After some further colloquy, the court concluded:  "Under

9

any analysis that I can think of, given that I have to give instructions only when there is sufficient evidence for a jury to find something, I don't think they can find transferred intent based on what we heard." Defense counsel did not comment or express any view on the issue. Defendant did not request, and the court did not give, instructions on voluntary manslaughter as to count 1.

The court gave the following instruction on the defense of accident: "When a person commits an act through misfortune or by accident under circumstances that show neither criminal intent nor criminal negligence, he does not thereby commit a crime."

In connection with the two counts of attempted murder, the court instructed the jury on self-defense. As to count 3—the attempted murder of Victor—the court further instructed as to attempted voluntary manslaughter.

The jury deliberated for five days. During that time the jury sent several questions to the court. During the morning of November 10, 2021, the jury asked two questions. The first question was: "When examining the right of self-defense in charge 3 [attempted murder of Victor], if the jury finds the defendant is able to claim self-defense, does the right of self-defense also extend to charges 1 [murder] and 4 [child abuse], or does the jury examine the right of self-defense in each charge independently of one another?" To this question, the court responded: "Self-defense applies to counts 3 [attempted murder of Victor] and 4 [child abuse] only." (Capitalization omitted.)

The second question was: "When examining malice aforethought, if the jury finds that malice aforethought exists in one charge, does that establish malice aforethought across

10

all charges, or do we need to establish malice aforethought in each individual charge?" The court responded: "You must establish malice aforethought in each individual charge."

On the afternoon of November 10, 2021, the jury asked two more questions. The first was: "In regards to malice aforethought in charge 1, does malice aforethought need to exist explicitly towards Susan, or if we establish malice aforethought is present towards any individual in this case, would it satisfy the element of malice aforethought?" In response, the court read CALCRIM No. 520 (first or second degree murder with malice aforethought).

The second question was: "When determining what is an unreasonable or reasonable perception of threat in regards to attempted voluntary manslaughter . . . when considering what a reasonable person would believe in that same situation [or] is the jury placing themselves in the mind of the defendant or judging their actions as an independent reasonable person?" The court responded to this question by referring to the previously given instruction under CALJIC No. 5.17 and stating: "It's a reasonable person. What would a reasonable person do? No other options there. Just what would a reasonable person do."

The court also allowed counsel to make further arguments with respect to the jury's questions concerning malice, self-defense, and imperfect self-defense.[6]

---

[6] The jury asked a fifth question regarding the child abuse count. "In count 4 is the jury examining the defendant's right to defense himself against the child specifically or if the defendant has the right to self defense based on the situation as a whole." The court responded: "You must identify the defendant's actions,

11

The jury convicted defendant of second degree murder, a lesser offense of the charge of first degree murder (§ 187), and found that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).  The jury found defendant not guilty of the attempted murder and child abuse counts, and found not true the personal firearm use allegation under section 12022.53, subdivision (d).

Defendant filed a motion for new trial, which the court denied.

At the sentencing hearing, the court rejected defendant's request to strike or reduce the gun enhancement.  The court sentenced defendant to 15 years to life in prison on the murder conviction, plus 20 years on the firearm enhancement.

Defendant timely appealed.

## DISCUSSION

### A.     Failure to Instruct on Transferred Self-Defense

Defendant contends that the court erred by failing to instruct the jury sua sponte as to transferred self-defense.  We disagree.

Under the doctrine of transferred intent, "a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had ' "the fatal blow reached the person for whom intended." ' "  (*People v. Scott* (1996) 14 Cal.4th 544, 546.)  The doctrine is founded upon the policy "that a defendant

---

if any, which caused the child unjustifiable pain or mental suffering.  If all of those actions were in lawful self-defense, the defendant is not guilty of count 4."

12

who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark." (*Id.* at p. 551.)

In *People v. Mathews* (1979) 91 Cal.App.3d 1018 (*Mathews*), the court applied the transferred intent doctrine to the theory of self-defense to "insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander." (*Id.* at p. 1024.) "Thus, a defendant is guilty of no crime if his legitimate act in self-defense results in the inadvertent death of an innocent bystander." (*People v. Levitt* (1984) 156 Cal.App.3d 500, 507.) Courts have since labeled this application of transferred intent, "transferred self-defense." (*People v. Waxlax* (2021) 72 Cal.App.5th 579, 592; *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1038.) In determining whether transferred self-defense applies in a particular case, the question is " 'whether the killing would have been justifiable if the accused had killed the person whom he intended to kill.' " (*Mathews*, *supra*, 91 Cal.App.3d at p. 1024.)

The killing of another in self-defense is justifiable and noncriminal if the defendant acted with "an actual and reasonable belief in the need to defend." (*People v. Stitely* (2005) 35 Cal.4th 514, 551.) If the defendant acted "upon an actual but unreasonable belief in the need for self-defense," he can be convicted of no crime greater than voluntary manslaughter. (*Ibid.*; *People v. Rangel* (2016) 62 Cal.4th 1192, 1226.) Both self-defense and imperfect self-defense are premised on the defendant's intentional act. (*People v. Wickersham* (1982) 32 Cal.3d 307, 328; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 50, fn. 7 (*Villanueva*); *Stitely*, *supra*, 35 Cal.4th at p. 551.)

Thus, if the doctrine of transferred self-defense applied here, defendant's killing of Susan could be justifiable and noncriminal if he fired his gun with the intent to shoot Rea while possessing an actual and reasonable belief in the need to defend against Rea, but shot Susan instead; or the killing could constitute voluntary manslaughter if he acted with the same intent, but his belief in the need to defend against Rea was unreasonable. (See *People v. Curtis* (1994) 30 Cal.App.4th 1337,1357 (*Curtis*) [transferred self-defense may "apply where the defendant intends to injure or kill the person who poses the threat, but inadvertently kills an innocent bystander instead"]).

In criminal cases, " 'the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' " (*People v. Sedeno* (1974) 10 Cal.3d 703, 715 (*Sedeno*).) The "court is required to instruct sua sponte on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case." (*Villanueva, supra,* 169 Cal.App.4th at p. 49; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 73.) Stated differently, even when there is substantial evidence to support a defense, the court does not have a sua sponte duty to instruct on the defense if the defendant is not relying on the defense and the defense is inconsistent with the defendant's theory of the case.

As our Supreme Court has explained, limiting the sua sponte duty to instruct in this way "is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*Sedeno, supra,* 10 Cal.3d at p. 716.)

14

Thus, although a defendant is entitled to instructions on inconsistent defense theories *when requested*—provided each theory is supported by substantial evidence—the defendant may not be placed in the position of having the jury instructed on inconsistent defenses theories in the absence of a request. (See *Villanueva, supra,* 169 Cal.App.4th at p. 52 [court was required to give instruction on inconsistent defenses when "defendant requested the instruction[s]"].)

Here, defendant did not seek an instruction on transferred self-defense and his counsel remained silent when the court raised the possibility of giving the instruction. Our record does not indicate that defendant relied, or sought to rely, on a transferred self-defense theory, and he does not assert otherwise on appeal. The defense theory as to count 1, as counsel expressed in opening and closing statements, was that the gun discharged accidentally as Rea grabbed defendant's hand and they struggled for control of the gun. Therefore, assuming arguendo that there is substantial evidence to support a transferred intent theory of self-defense or imperfect self-defense, the issue is whether these theories are inconsistent with the theory upon which defendant relied: The killing of Susan was an accident.

As noted above, traditional self-defense and imperfect self-defense are both premised on the defendant's intentional act; in this case, the intentional shooting of a gun. As such, these defenses and the defense of "accidental homicide are mutually exclusive." (*Curtis, supra,* 30 Cal.App.4th at p. 1358.) Therefore, "a defendant who claims to have killed by accident while defending him or herself is not thereby entitled to jury instructions on self-defense." (*Ibid.*; see also *Villanueva, supra,* 169 Cal.App.4th at p. 50 ["an accidental shooting is *inconsistent*

15

with an assertion of self-defense"].)  Because defendant asserted that he killed Susan by accident and relied on that theory at trial, the court did not err in declining to instruct the jury sua sponte on inconsistent theories of transferred self-defense or imperfect self-defense.[7]

Defendant relies on *Villanueva, supra,* 169 Cal.App.4th 41 and *People v. Elize* (1999) 71 Cal.App.4th 605 (*Elize*), in asserting that the inconsistency between transferred self-defense and the theory he relied upon below does not preclude an instruction on transferred self-defense.  In *Villanueva* and *Elize*, the defendants had testified that their act of shooting their victim was an accident.  The defendants' attorneys, however, requested instructions on self-defense, as well as accident, and the trial court refused the requests.  The Courts of Appeal reversed, and held that, although the theories of accident and self-defense were inconsistent, the trial courts erred by refusing defendant's request to instruct on self-defense.  In each case however, the Court of Appeal's holding was based in part on the fact that the defendants' counsel requested the self-defense instruction.  (*Villanueva, supra,* 169 Cal.App.4th at p. 52 [because "there was sufficient evidence of self-defense, *and defendant requested the*

---

[7] In defendant's opening brief, he separates his arguments regarding the failure to instruct on self-defense and imperfect self-defense under separate headings.  Because both arguments fail for the same reason—these defenses are inconsistent with his defense of accident—we address them together.  (See *Villanueva, supra,* 169 Cal.App.4th at p. 50, fn. 7 [in considering whether self-defense theories are inconsistent with defense of accident, the court "consider[ed] self-defense and imperfect self-defense somewhat interchangeably, as the key issue in dispute is whether defendant acted *intentionally*"].)

*instruction*, the trial court was required to give the instruction," italics added]; *Elize, supra*, 71 Cal.App.4th at p. 616 ["the trial court should have allowed the jury to determine the self-defense issue by instructing upon it *when requested*," italics added].) By contrast, defendant did not request a transferred self-defense instruction. *Villanueva* and *Elize* are thus inapposite.

Defendant also relies on *People v. Mayweather* (1968) 259 Cal.App.2d 752. In that case, the defendant and the victim had been in a physical altercation. As the victim ran toward the defendant, the defendant picked up a gun. The gun discharged, causing the victim's death. (*Id.* at p. 755.) The defendant said he did not mean to shoot the victim. (*Ibid.*) The trial court did not instruct on self-defense, and the Court of Appeal reversed, stating that "a self-defense instruction should have been given." (*Ibid.*) The *Mayweather* court's brief opinion does not indicate whether defendant requested an instruction on self-defense, and it has never been cited to support the proposition defendant asserts here: that the court must instruct on a theory inconsistent with a theory upon which the defense is relying in the absence of a defense request for the instruction. To the extent that *Mayweather* can be read to support defendant's argument, we decline to follow it.

### B.    Failure to Instruct on Voluntary Manslaughter

Defendant contends that the court erred by failing to instruct the jury sua sponte on voluntary manslaughter. We disagree.

Voluntary manslaughter is a lesser included offense to the charge of murder. (*People v. Steskal* (2021) 11 Cal.5th 332, 345; *People v. Thomas* (1987) 43 Cal.3d 818, 824.) The trial court is required to " 'instruct on all lesser included offenses supported

17

by substantial evidence,' " that is, " ' "evidence that a reasonable jury could find persuasive." ' " (*Steskal*, *supra*, at p. 345.)

An unlawful homicide may be reduced to voluntary manslaughter in two ways:  When the defendant kills in imperfect or self-defense—that is, in the unreasonable but good faith belief in having to act in self-defense; or when the defendant kills in a sudden quarrel or heat of passion.  (*People v. Schuller* (2023) 15 Cal.5th 237, 252.)

Defendant's imperfect self-defense theory is premised on the doctrine of transferred self-defense, which we rejected in the preceding part.  We reject defendant's argument regarding a heat of passion instruction for a different reason.  To warrant an instruction on this theory, there must be substantial evidence that the defendant killed his victim " ' "due to 'sufficient provocation,' " ' " which was " 'caused by the victim' " or by conduct the defendant reasonably believed the defendant engaged in. (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.)  "It is well settled" that the provocation that may reduce murder to manslaughter "must be caused *by the victim*, not a third party." (*People v. Nunez* (2023) 97 Cal.App.5th 362, 369, citing *Moye*, *supra*, at pp. 549–550, *People v. Avila* (2009) 46 Cal.4th 680, 705, and *People v. Verdugo* (2010) 50 Cal.4th 263, 294.)  Here, the victim, Susan, merely stood up from her seat at the table and turned to protect her child from being shot.  There is no evidence in the record that she did anything that would have caused "an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Moye, supra*, at p. 550.) There was therefore no error in failing to instruct on voluntary manslaughter based on heat of passion.

## C.    The Court's "No Lawful Excuse" Comment

During deliberations, the jury sent several questions to the court, including the following:  "In regards to malice aforethought in charge 1 [the murder of Susan], does malice aforethought need to exist explicitly towards Susan, or if we establish malice aforethought is present towards any individual in this case, would it satisfy the element of malice aforethought?"  In response, the court read the following definition of malice aforethought based on CALCRIM No. 520:  "There are two kinds of malice aforethought.  Express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.  So the defendant acted with express malice if he unlawfully intended to kill, or he acted with implied malice if he intentionally committed an act, the consequences of the act were dangerous to human life, at the time he knew his act was dangerous to human life, and he deliberately acted with conscious disregard for human life.  [¶]  Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or any passage of any particular time."

To illustrate the instruction without "trying to go beyond [the jury's] question," the court provided the jury with the following hypothetical based on "an old western movie.  An individual, a cowboy, comes out and fires a gun down the dirt street towards the saloon.  There are people standing in front of the saloon and an individual is killed.  The jury for the cowboy would need to decide for each shot fired, if there is more than one, did the cowboy intend to kill or did the cowboy act with reckless disregard for life knowing it was dangerous?  Those

19

are the only elements with respect to intent. In this fact pattern *we're not talking about any lawful excuse.* I'm just focusing on malice aforethought. These elements do not require a decision as to who the person was that the defendant shot at or intended perhaps to kill or why. It's just these elements. That's what you're looking at. Just focus on these elements." (Italics added.) There was no objection to the court's statements.

Defendant contends that the court's statement, which we have italicized above—"we're not talking about any lawful excuse"—amounted to "a directed verdict of guilt because the charge resolved the issue [of malice] for them." Even if the issue has been preserved for appeal in the absence of an objection below, the contention is without merit.

In reviewing a challenge to a court's instructions to the jury, we consider the challenged statements in their context, not in isolation, and in light of the entire charge to the jury. (*People v. Holt* (1997) 15 Cal.4th, 619, 677; *People v. Wilson* (1992) 3 Cal.4th 926, 943.) Here, the court's cowboy hypothetical was given to illustrate the meaning of malice aforethought— the subject of the jury's question—and the court made clear that it was not intended to address issues "beyond [the jury's] question," such as what constitutes a lawful excuse for homicide. A potential lawful excuse in this case—accident—is addressed in another instruction, about which the jury apparently had no question.

Read in its context, we do not believe the jury could reasonably have understood the court to mean that there was no lawful excuse for defendant's shooting of Susan. Rather, the court's statement, "we're not talking about any lawful excuse," would have reasonably been understood to mean that the court,

20

through its hypothetical, was not addressing the possibility that the hypothetical cowboy had a lawful excuse for his actions, but only the narrow question of whether he acted with malice aforethought.

The court's statement, we conclude, was not error.

## D.    Cumulative Effect and Ineffective Assistance of Counsel

Defendant contends that the cumulative effect of the alleged instructional errors addressed above rendered the trial unfair and a denial of due process. Because we conclude that there was no instructional error, this argument fails.

Defendant argues that if we determine that the arguments he asserts on appeal concerning alleged instructional error were forfeited by his counsel's failure to raise them below, then he was denied his constitutional right to the effective assistance of counsel. We have, however, addressed and rejected defendant's instructional error arguments on the merits. Therefore, any possible deficiency in failing to object did not result in the denial of defendant's constitutional right to the effective assistance of counsel.

## E.    Substantial Evidence of Murder

Defendant next contends that the judgment should be reversed because there is no substantial evidence to support the second degree murder conviction. The contention is meritless.

Substantial evidence is that which is "reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Our evaluation of the sufficiency of the evidence to support defendant's murder

21

conviction is " 'independent of the jury's determination that evidence on another count was insufficient.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 656, quoting *United States v. Powell* (1984) 469 U.S. 57, 67.)

Murder is an unlawful killing of a human being committed with malice aforethought. (§ 187, subd. (a); *People v. Blakeley* (2000) 23 Cal.4th 82, 87.) Second degree murder "is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.)

Malice is express when the defendant has the intent to kill (*People v. Soto* (2018) 4 Cal.5th 968, 970), and can be inferred from "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse." (*People v. Smith* (2005) 37 Cal.4th 733, 742.)

Here, Chavarria testified that he was next to Susan at a table across from defendant. Immediately after defendant shot Victor, defendant pointed his gun in Susan's and Chavarria's direction. Defendant fired the gun, hitting Susan.

Rea testified that defendant shot Victor, then pointed his gun "[d]irectly at Susan" and shot her. It was not until after defendant fired the shot that killed Susan that Rea acted to knock the gun out of defendant's hand.

A medical examiner testified that the bullet fired from defendant's gun hit Susan in her left arm, entered her chest cavity, perforated her lungs, and caused her death.

The foregoing evidence is reasonable, credible, and of solid value, and thus sufficient to support the jury's verdict of second degree murder.

## F.     The Court's Discretion to Strike or Reduce the Gun Use Enhancement

Defendant contends that we should direct the court on remand to exercise its discretion to either strike or reduce the gun enhancement.  We decline to do so.

Prior to the sentencing hearing, defendant filed a sentencing memorandum in which he requested the court exercise its discretion to strike the gun enhancement imposed under subdivision (c) of section 12022.53, and impose a lesser enhancement under either subdivision (a) of that statute or section 12022.5, subdivision (a).  At the sentencing hearing, the court stated that it had read and considered the defendant's memorandum and denied defendant's request, stating it was "exercis[ing its] discretion to add 20 years for the gun use."  The court explained that there was "no reason [for defendant] to be pointing the gun at Susan."  Defendant could see that Susan was behind Rea, "trying to shelter her son, trying to get down," but "[s]he couldn't get down because of where the body of [Victor] had laid.  [Defendant] knew that.  And yet, he pointed that gun, he had cocked that gun again and pointed it at Mr. Rea."  The court concluded that "the gun use allegation" and "the sentence to be appropriate."

It thus appears from the record that the court was aware of its authority and discretion to strike or reduce the gun enhancement, and that it exercised that discretion by imposing the sentence authorized by the jury's findings.  A further sentencing hearing is not required.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

                                        ROTHSCHILD, P. J.

We concur:


BENDIX, J.


WEINGART, J.